# CAPITOL TRACTION COMPANY, A Corporation,

## *vs.*

## THOMAS RICHARD McKEON, by Lawrence E. Brown, His Next Friend.

*Evidence: legal sufficiency; how to be passed on.  Employer and
employee: negligence; assumption of risk.  Evidence:
exceptions; where already admitted.  Trials:
improper questions; discharge of jury;
discretion of court.*

The legal sufficiency of evidence is a question of law for the court, but the comparative weight and value of testimony is a question exclusively for the jury upon proper instruction from the court.                                                p. 86

In determining the legal sufficiency of evidence, the truth of the evidence offered in support of the proposition sought to be maintained by it must be assumed, and if such evidence is of sufficient probative force to enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the proposition, a prayer taking the case from the jury will not be granted, although such evidence be contradicted in every particular by the opposing evidence in the case.            p. 86

The theory of the assumption of risk by an employee does not apply as a defense to an action of negligence, unless the risk is obvious or is known or is appreciated by him.       p. 90

An exception to evidence should not be sustained where the same has already been admitted without objection.        p. 90

Where a motion is made to summarily discharge the jury be-
cause of an improper question asked a witness by the opposing
counsel, the disposition of the motion is in the discretion of the
trial court.                                              p. 91

It is error to submit to a witness a question that it is the
province of the jury to decide.                           p. 92

*Decided January 16th, 1918.*

Appeal from the Circuit Court for Montgomery County.
(PETER and WORTHINGTON, JJ.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE,
BURKE, PATTISON, URNER, STOCKBRIDGE and CONSTABLE,
JJ.

*G. Thomas Dunlop* and *Arthur Peter,* for the appellant.

*Charles W. Prettyman* (with whom was *John A. Garrett*
and *Talbott & Prettyman* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellant, the Capitol Traction Company, owns and
operates an electric railway in the City of Washington, with
its lines extending into Montgomery County, Maryland.

The appellee, Thomas Richard McKeon, was prior to, and
on the 13th day of May, 1916, employed by said company as
an assistant fireman at the company's power house, in the
District of Columbia.

On the morning of the 13th day of May, 1916, while the
plaintiff was at work in the performance of his duties, he
suffered personal injuries caused by the explosion of a steam
pipe, tube or coil in one of the defendant's boilers, located in

the power house; and this suit was brought to recover for such injuries.

In the trial of the case below the jury, by its verdict, awarded him damages to the extent of $2,000 and a judgment was entered upon the verdict for said sum. It is from that judgment this appeal is taken.

It will be necessary for us to go somewhat fully into the facts of this case, as the defendant by its first prayer, which was refused, asked that the case be taken from the jury because of a want of legally sufficient evidence to entitle the plaintiff to recover.

The declaration charges that the defendant, wholly disregarding its duty, negligently permitted said hot water coil to become impaired so that it was unsafe and dangerous to the life of the plaintiff, and said defendant "did not use due care, caution and diligence in the care, inspection and operation of said hot-water coil, but permitted the same to corrode, rust and *weaken* so that the said coil was unable to carry the amount of steam, water and vapor that was necessary to operate said electrical plant," causing the coil of the boiler to explode, resulting in the injuries complained of.

It is contended by the defendant that there is no evidence of the negligence charged against it in the declaration from which the accident resulted legally sufficient to go to the jury, and that its first prayer should have been granted.

The plaintiff at the time of the accident was about 19 years of age, and had been in the employment of the company for nearly four years. His duties consisted of oiling the pumps, lighting the stoker engines and helping the firemen.

In the power house there are twelve boilers used in generating electricity for the operation of defendant's street railway lines in the District of Columbia and Maryland. Four of these are regularly operated each month, one is banked and held in reserve for two months, and the others are out of service for two months; at the expiration of said periods

those in service are taken out of service, and a like number of the others put in service for the same period, so that each boiler is in service one month and out of service two months. The boilers are arranged in two rows of six each, facing each other, with a firing alley between them, and under each boiler is a furnace or a fire box.

The pipes or tubes, which we will hereafter refer to as tubes, are of iron and are four inches in diameter. In each boiler there are fourteen rows of tubes, one above the other, with twenty-one tubes in each row, with a space of two or three inches between them.

The plaintiff testified that he on the morning of the accident was getting No. 1 boiler, the reserve boiler, ready to start up, "and just as he got the grate down" he heard a big explosion in boiler No. 7, directly across the alley, and from it came fire and steam, knocking one Harvey, an employee of the company, against him, throwing them both to the ground and burning the plaintiff about the arms, chest, legs, face and ears.

At the time of and prior to the accident William Walter Locke was employed by the defendant company as foreman of the boiler room. He, in addition to other duties, was required to clean, inspect and keep in repair, the boilers and other machinery connected therewith, and to whom his subordinates were required to report any and all imperfections in the boilers, etc., that came to their knowledge.

In the employment of the company at this time was a younger brother of the plaintiff, George McKeon, whose duties and compensation were the same as those of his brother; he, however, worked at night, while the plaintiff was on duty in the daytime. They both had to assist in cleaning and keeping clean the boilers. This involved the removal, by means of an air hose, the dirt and soot that accumulated between the tubes of the boiler so that the flames could freely pass between the tubes.

The pipe on the end of said air hose was what is known as a three-eighth-inch pipe, about three-quarters of an inch in diameter on the outside. As we have said, the tubes of the boiler were about two inches apart, and it was between them that the hose pipe was inserted to clean therefrom the accumulated dirt and soot. This was done by each of the boys.

George testified that about the 8th or 9th day of May, four or five days before the happening of the accident, he noticed that the hose pipe would not go in between the tubes and would "work hard in there"; that there was not enough room for the pipe to go in, and he told Locke about it, telling him that the tube was swelled and he "could not half blow out the tubes." That he reported these facts twice to Locke, the first time on the next morning after discovering the same, and Locke said: "That is nothing; that will not hurt anything." He further testified that he blew the tubes the night before the accident and that the tubes on that night were so swelled that he could not get his three-eighth-inch pipe in there, and that such condition had lasted for three, four or six days; that prior thereto there had been no trouble. He also stated that it was his further duty when he found any defect to notify the head fireman, Wigginton, and that he notified him before notifying Locke of the difficulty he had experienced in cleaning the tubes.

Upon cross-examination, the witness testified that the back of the tubes was blown by steam by the fireman, while the front of the tubes was blown by the witness by the use of an air hose inserted through the holes upon the side of the boiler; that he could not get the air pipe between the second row from the bottom, but had no trouble with any others. It was only the one row, and that the tube where the trouble existed was halfway across the boiler from the air-pipe hole and was on the side opposite him. He further testified that he did not know whether his brother had noticed it; he had not said anything to him about it.

He also stated in his cross-examination that when he first reported the trouble to Locke he said to him that the defect was in No. 7 boiler, and that he could find it; "that there is something wrong with those tubes; I could not get the rod back in there to get the dirt off; there seems to be something wrong with them"; and Locke replied that he would look after it. When reported to Locke on the second occasion he told him that "those boilers are in the same way; they are getting dirty, and I couldn't do anything with them; I couldn't get them clean." Locke in reply thereto said he had "not yet had time to fix it; to keep on going."

After the accident the defective part where it exploded was cut from the tube and a piece was also cut from one end of it. These were shown to both James R. Gearhart and Robert E. Monroe, the former in charge of the Gerlick-Henderson Company, of New York, Chicago and Pittsburg, the business of which company is to inspect car wheels, axles, boiler plates, boiler tubes, etc.; and the latter chief boiler inspector for the Hartford Boiler Inspection and Insurance Company of Hartford, Conn. Gearhart testified that the variations in the thickness of the tube were such that it would have been rejected if inspected by him before being placed in the boiler; that at the point where the tube exploded the metal was exceptionally thin.

Monroe when asked for his opinion as to the cause of the explosion said "there was an appreciable difference in the thickness of the metal, between the top part and the two sides; usually the tubes are uniform, but this does not appear to be one of that kind; it appears to have been considerably thinner at the point at which it burst, and he did not think it could possibly have been as thick and stretched out to that extent, but he supposes in the rupture it thinned a little more than it was previous to the failure. That there was no evidence of deterioration in the tube in question by corrosion, over-heating, or otherwise; and no evidence of blisters or bulging. In his opinion the explosion was caused by an

original defect in the tube, both in structure and in quality of material, that is, chemically and physicaly.  He further testified that it would not have been possible to discover the chemical defects in the tube even before it was put in place in the boiler, though it would have been quite possible to discover an unusual variation in thickness at the ends; but "if it had been discovered a few days prior to the explosion that there was a bulge in the tube it would have been the proper thing to let the fire go out, and remove the tube as it would be dangerous if they knew that."

John H. Hannah, vice-president and general manager of the defendant company, testified that when the boiler was delivered to the company each of the tubes were installed in headers and were fabricated into sections so that it was impossible to have inspected the material forming the tubes. It is also in the evidence that the boilers were inspected at regular intervals, and that boiler No. 7 was inspected before being put into service on the 1st day of May, thirteen days before the happening of the accident.

Both Wigginton and Locke denied that George McKeon had, at any time or place, prior to the accident said to either of them that there was anything wrong with the tubes in No. 7 boiler, or that he could not get the air pipe between the tubes in cleaning them, and Locke further stated that no one else told him of any such defective condition in boiler No. 7 and that he did not know of such condition.  Hoshall, stationary engineer in charge of the power house, and Locke and Wigginton, witness for the defendant, testified that the tube which exploded was the seventh one from the left side in the fourth row up from the bottom, and not in the second row from the bottom, showing as the defendant contends that the accident did not result from an explosion of the tube, to the defective condition of which George McKeon testified he had called their attention prior to the accident, and consequently the negligence charged against it of not inspecting the boiler, to ascertain the character of the alleged trouble

with the tube in the second row, has no causal connection with the injury complained of.

In this connection, however, the testimony of R. H. Brown must be considered. Brown then an employee of the company was present at the time of the accident and carried the plaintiff to the hospital. He testified that upon his return from the hospital while the fire was still hot where it had been dumped, he looked at the boiler, and that he again looked at it the next morning, and that the exploded tube was in the second or third row from the bottom, although upon cross-examination he stated he did not know whether it was in the second, third or fourth row.

As this Court has frequently said it is the settled law of this State, that the legal sufficiency of evidence is a question of law for the Court, but the comparative weight and value of the testimony is a question exclusively for the jury, under proper instructions from the Court: *Patapsco Loan Company* v. *Hobbs,* 129 Md. 9; *B. & O. R. R. Co.* v. *Keedy,* 75 Md. 324; *Moyer* v. *Justis,* 112 Md. 220, and it is equally as well settled that in determining this legal question, the truth of the evidence offered in support of the proposition sought to be maintained by it, must be assumed; and if such evidence is of sufficient probative force to enable an ordinary intelligent mind to draw a rational conclusion therefrom, in support of such proposition, the prayer will not be granted: *Baltimore Elevator Co.* v. *Neal,* 65 Md. 459, although such evidence be contradicted in every particular by the opposing evidence in the cause. *M'Elderry* v. *Flannagan,* 1 H. & G, 308; *Leopard* v. *Ches. & Ohio Canal Co.,* 1 G. 222; *Jones* v. *Jones,* 45 Md. 154; *Mallette* v. *British Assn. Co.,* 91 Md. 481; *Moyer* v. *Justis, Supra.*

Therefore, it is only necessary for us to consider the evidence offered in support of the charge of negligence alleged against the defendant, to the extent of ascertaining whether it has the required probative force, and should we find that it has, then the action of the Court below, in refusing the

prayer must be affirmed, although the evidence in opposition to it be overwhelming, for as we have said its comparative weight and value is for the jury, whose conclusion therefrom is not reviewable by us.

In support of the alleged negligence of the defendant, is the evidence of George McKeon, an employee of the company, whose duty it was to inform Locke of any trouble or defect in the boiler or machinery discovered by him, that he twice notified Locke prior to the accident, of the defective condition of one or more of the tubes of the boiler, telling him that if he inspected the boiler he could find the trouble referred to by him, but he treated the matter as of no consequence and made no effort prior to the happening of the accident to ascertain the character or location of the trouble. Had he examined the boiler at the place to which his attention had been directed and had not found at that place the difficulty mentioned by George McKeon, he, with a proper appreciation of his duties and responsibilities would not have concluded his examination, without at least examining the tubes in the near-by rows of the boiler, as they were only from two to three inches apart, and had he done so he might and probably would have found the defect causing the explosion which in all probability was the one alluded to by George McKeon, although he may have inaccurately located it in the second row of tubes.

Accompanying this evidence is that of Brown who saw the boiler twice after the explosion. He testified that the exploded tube was in the second, third or fourth row of tubes from the bottom, one of which was the row in which George McKeon located the defective tube.

Applying the test stated above we think the evidence of George McKeon and Brown was legally sufficient to go to the jury as tending to show the negligence charged against the defendant, notwithstanding the evidence offered by the defendant that the defective tube was in the fourth and not in the second row from the bottom as stated by George

McKeon. We therefore find no error in the ruling of the Court in refusing to grant the prayer.

The Court granted the plaintiff two prayers. The first we think properly states the law as to the liability of the defendant, and the second is the usual damage prayer.

The latter prayer the defendant contends should not have been granted, inasmuch as the case was tried under the Federal Employer's Liability Act, and it contains no instructions to the jury that in estimating the damages they were to consider the contributory negligence of the plaintiff in reduction of the damages. The answer to this objection is that in our opinion the record fails to disclose any contributory negligence on the part of the plaintiff.

It is claimed by the defendant that as it was the duty of the plaintiff to report any and all defects in the boiler, that might be found by him to exist therein, to Locke, his failure to report the alleged condition of the tubes was contributory negligence.

The plaintiff testified that he did not know of the alleged trouble in the tubes or in fact any defect in them, and was not told of the same by his brother. It is not at all surprising that his brother did not tell him after being told by Locke that the trouble reported to him was "nothing"; but it is contended by the defendant, that if the brother, whose duties were the same as the plaintiff's, discovered the said defect he also should have discovered them. It does not follow that the plaintiff would see or know every thing that George saw or discovered in connection with the boiler, the fact that the hose pipe would not pass readily between the tubes may have left little or no impression upon the mind of the plaintiff, as the danger incident thereto may not have been appreciated by him as it was by his brother. He was only to report such things as impressed him as needing correction or that he was told to report, and it is not disclosed by the record that he was told to report a fact of the character of that reported by his brother. In our opinion his

failure to learn of and report the condition of the tubes discovered by his brother was not contributory negligence to be considered by the jury in estimating the damages suffered by the plaintiff.

The defendant offered in all nineteen prayers. The first as we have said was rejected; the 2nd, 3rd, 11th, 14th, 15th and 17th were granted; the 16th granted as amended, and the others rejected. Prayers 4, 5, 5½, 6 and 7 may be considered together. These prayers were properly rejected, if for no other reason, because they ignored the evidence of George McKeon, as to the notice given by him to Locke of the alleged defective condition of the boiler. The 8th prayer was also properly rejected; and we find no error in the ruling of the Court upon the 9th and 13th prayers upon the question of assumed risk.

The risk mentioned in these prayers that the plaintiff is said to have assumed in continuing in the employment of the defendant arose from the condition of the tubes that * * * were reported to Locke by George McKeon.

The plaintiff knew nothing of such defect in the tubes, or of any defect in the boiler, and it is not claimed by the defendant that he did, but it contends that he, as an ordinarily prudent person, in the exercise of ordinary care, could have learned of said conditions, while engaged in the performance of his duties; and this contention it seems is based entirely upon the fact that his brother learned of the condition of the tubes while employed in the performance of like duties. We have already expressd our views as to the unsoundness of this reasoning, in discussing the ruling of the Court upon the plaintiff's second prayer, and we need not repeat it here. But assuming that he by the use of ordinary care could have learned of the condition of the tubes, there is no evidence in the case tending to show that the risk and peril incident to the condition of the tubes, as described by the brother were obvious to an ordinary prudent person, in his situation, or that such person under the circumstances of

the case could have appreciated the risk arising from such condition of the tubes. As stated in 26 *Cyc.* 1225: "Unless the risk is obvious, or is known and is appreciated by the servant, he does not assume it, if it might have been avoided by due care on the part of the master." The Court we think committed no error in rejecting these prayers. It also correctly ruled upon the defendant's 10th prayer for the reasons assigned by us, in support of its action in granting the plaintiff's second prayer.

Whether Locke was a competent person to inspect the boilers reflected upon the question whether the boilers were properly inspected, and the Court we think was right in rejecting the defendant's 12th prayer. The Court's amendment to defendant's 16th prayer was properly made as it eliminated from the prayer, as offered, that part of it which ignored the notice to the defendant of the defective condition of the tubes.

The first exception to the evidence is upon the Court's ruling allowing Brown to testify that Locke told him that prior to his entering the employment of the defendant he was a brick-layer. Brown had previously testified without objection that Locke was a brick-layer, and Locke thereafter, when upon the stand also testified that he was a brick-layer before entering defendant's employment, therefore we fail to see how the admission of Brown's statement that Locke told him he was a brick-layer could in any way have injured the defendant. The 2nd exception was to the refusal of the Court to grant defendant's motion which, in effect, asked that the evidence admitted **under the** first exception be stricken out. The third exception was to the refusal of the Court to discharge the jury. John H. Hanna, vice-president of defendant company when upon the stand, after speaking of the probable cause of the explosion, was asked by plaintiff's counsel "do you recall what defect there was when that woman and three children were killed"? Whereupon, counsel for the defendant at once asked that the jury be dis-

charged from the consideration of the case because of such "palpable effort to improperly influence them in the verdict."

The Court promptly ruled denying the motions, but stated that "the question was an exceedingly improper one which could have been only asked for the purpose of improperly influencing the minds of the jury and the jury will not consider it." It was the judgment of the Court that the motion asking for the summary discharge of the jury should be denied, and they so acted, feeling that the ends of justice would be fully subserved and the rights of the parties fully protected by administering a rebuke to the counsel of the plaintiff and by directing the jury not to consider the question. The disposition of the motion was largely in the discretion of the Court and as they were present and in a position to better weigh the effect of the question upon the jury we will not assume to say that they erred in refusing to grant the motion, summarily discharging the jury because of the incident stated. *Esterline* v. *State,* 105 Md. 629.

The fourth exception is to the rejection of the hypothetical question asked of the witness Monroe. This question was faulty because of its failure to include therein other essential facts that had been offered in evidence. It altogether ignored the evidence of notice to the defendant of the defective condition of the tubes. The witness was in effect asked to say upon the facts stated in the question whether the defendant properly cared for the boilers, without submitting to him the fact that the defendant had been notified of a defect in the tubes and had taken no step to correct the same. The defendant may have adopted the usual methods of inspecting, yet when notified of a defect in the boiler it was its further duty to locate the defect and if possible to correct it.

Had the Court allowed the witness to answer the question embraced in the fifth exception, it would, by so doing, have submitted the decision of a question to the witness that the jury alone should have decided. Whether it was necessary

for Locke to have been a steamfitter was a question for the jury to decide upon all the facts adduced in the case. The witness had testified as to the duties and competency of Locke, and Locke himself testified that he had made the necessary repairs to the boilers and had prepared them for service, and it would have been misleading to the jury to have submitted testimony to it as to whether it was necessary for Locke to be a steamfitter. The question in the sixth exception, we think, was competent, but it was not material, and the judgment should not be reversed on that ground. Without further prolonging this opinion with a discussion of the remaining three exceptions, we will state that we find no error in the Court's ruling upon them; the last one being a renewal of the motion for the discharge of the jury for additional alleged improprieties on the part of the counsel of the plaintiff.

Therefore, as we find no reversible error in the rulings of the Court below, the judgment will be affirmed.

*Judgment affirmed, with costs to the appellee.*