An appropriate order granting such compensation will be entered.

Vernon **GRAY**, Plaintiff,

v.

**GRAIN DEALERS MUTUAL INSURANCE COMPANY, and R.W.**
Parker Associates, Inc., Defendants.

Civ. A. No. 86–1782.

United States District Court,
District of Columbia.

May 13, 1988.

Howard L. Siegel, Rockville, Md., for plaintiff.

Ralph Boccarosse, Jr., Fairfax, Va., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

On August 10, 1985, plaintiff Vernon Gray was seriously injured when he was struck by an automobile driven by one Wendell Speed in the District of Columbia. Speed's automobile liability coverage was written by defendant Grain Dealers Mutual Insurance Company ("Grain Dealers"), an Indiana insurer. Speed, since deceased, was, at the time the policy was issued, a resident of North Carolina. The applicable monetary liability limit on Speed's policy was $25,000.

Grain Dealers was timely notified of the accident and placed the claim with R.W. Parker Associates, Inc. ("Parker"), an adjuster located in the Virginia suburbs of Washington, D.C., for appropriate handling. On September 25, 1985, Gray sued Speed in the U.S. District Court for the District of Columbia.[1] Speed was served with process on October 3rd, so advised Parker, and, on or about October 22nd, Parker contacted Gray's attorney and obtained an informal, indefinite extension of time to answer the complaint while it conducted an investigation.

Having heard nothing definitive from Parker in the meantime, on January 7, 1986, Gray's attorney wrote Parker to advise, *inter alia*, that Gray would accept "policy limits" to settle the case (assuming Speed's coverage was less than $100,000), and that the extension of time to respond to the complaint would be withdrawn on January 27th.

Apparently through oversight alone Parker failed either to respond to the offer to settle or to cause answer to be made to the complaint. Accordingly, on January 30,

1986, Gray had default entered against Speed, and on February 26th, following an *ex parte* hearing on damages, the Court entered judgment for Gray against Speed in the amount of $334,000.[2] Gray's attorney's letter of January 7th was first forwarded to Grain Dealers by Parker sometime in April.

On June 13, 1986, Gray and Speed entered into a written agreement, entitled "Assignment of Chose in Action and Release From Judgment," whereby Speed assigned his rights against Parker and "Grain Buyers" [sic] to Gray, and Gray, in consideration, "released" Speed from the judgment. The document was then filed with the Court in Civil Action No. 85–3056.

On June 25th Gray filed this action against Grain Dealers and Parker alleging, as Speed's assignee, claims of breach of contract, negligence, and "bad faith" in failing to defend or settle.

On July 10th Grain Dealers answered the complaint, and it also filed a "motion for relief from judgment" *in its own name* in Civil Action No. 85–3056, which, of course, Gray promptly moved to strike on the ground that Grain Dealers was not a party to the case, and that Speed had already been "relieved" of the judgment by the release. (Grain Dealers, in effect, abandoned its own motion upon its realization that any "relief" it might obtain for itself would come at the expense of its insured.)

On August 30, 1986, Wendell Speed died (aged 30) in the District of Columbia.

On September 5, 1986, the Court granted Gray's motion in Civil Action No. 85–3056 to strike Grain Dealers' motion for relief from a judgment in a case to which it was not named, and had never been admitted as, a party.

The case is presently before the Court on cross-motions for summary judgment by Gray and Grain Dealers against one anoth-

1. *Gray v. Speed,* Civil Action No. 85–3056 (Jackson, J.).

2. The Court found that the accident had proximately caused comminuted compound fractures of all metatarsal and cuboid bones, and a closed fracture of the calcaneus, in Gray's right foot, and a fracture of his right fibula. He was hospitalized twice for a total of 57 days, and underwent three surgical procedures. His medical expenses were $34,000. Gray had reached optimum recovery at time of hearing, but still retained a 75–80 percent permanent partial disability of the extremity. He had a life expectancy of just under 30 years.

er. (Gray's claim against Parker, and Grain Dealers' claim-over against Parker, remain pending). The foregoing facts are stipulated to be the material facts. Both parties have waived the right to present additional evidence. Grain Dealers concedes that Parker was its agent and that its failure to act upon the January 7th letter was both a breach of its contractual duty to Speed under its policy and was negligent. For his part Gray concedes that the evidence does not show that the failure to act was malicious or willful, and that he cannot, therefore, recover punitive damages. Grain Dealers contends that, having "released" Speed from liability on the judgment, Gray has, in effect, released it from liability to Speed on its policy, but that, in any event, its liability cannot exceed its policy limit of $25,000. Gray contends that he is entitled to recover the entire amount of the judgment from Grain Dealers.

The case thus presents three discrete issues for resolution: (1) a choice of the state law to be applied to govern the latter two issues; (2) the effect to be given the instrument by which Speed purported to transfer his rights against Grain Dealers to Gray; and (3) the measure of his recovery, if any, thereon.

### I.

Because choice of law is a substantive issue under the *Erie* doctrine,[3] in determining a choice of law question in a diversity case a federal court applies the law of the forum state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Steorts v. American Air Lines, Inc.*, 647 F.2d 194, 196–97 (D.C.Cir. 1981). Employing what has been termed the "interest analysis" approach, the court of appeals has instructed that this Court is to "determine the relationship of each jurisdiction to the controversy, and to evaluate the interest of each in the application of its own rule of law." *Mazza v. Mazza*, 475 F.2d 385, 387–88 (D.C.Cir.1973); *see also Fox-Greenwald Sheet Metal Co. v. Markowitz Bros. Inc.*, 452 F.2d 1346, 1353–54 (D.C.Cir.1971). The law of the jurisdiction with the more substantial interest applies. *Dovell v. Arundel Supply Corp.*, 361 F.2d 543, 544 (D.C.Cir.), *cert. denied*, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966).

Grain Dealers does not dispute the validity of Speed's "assignment" of his rights against it to Gray, but it contends that the "release" portion of the instrument simultaneously relieved it of its contractual duty to, in the language of its policy, "pay damages for bodily injury ... for which [the insured] becomes legally responsible because of an automobile accident." Once Speed was no longer "legally responsible" to Gray, it says, neither was it. And, having found what it believes to be favorable case law from the state of North Carolina, Grain Dealers urges that North Carolina law applies to govern the significance of the Speed–Gray transaction.[4]

The factors to be considered in choosing the applicable rule of law include the relative interests of the several jurisdictions in a determination of the particular issue in accordance with its public policy, the protection of justified expectations of interested parties, the basic policies underlying the particular field of law, and certainty and uniformity of result. *See* Restatement (Second) Conflict of Laws § 6 (1971). The "contacts" to be taken into account in applying these principles to a contractual agreement include: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter; and the resi-

---

3. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

4. In *Huffman v. Peerless Insurance Co.*, 17 N.C. App. 292, 193 S.E.2d 773, *cert. denied* 283 N.C. 257, 195 S.E.2d 689 (1973), an intermediate state appellate court held that a consent judgment entered in favor of an accident victim against an insured which, by its terms, provided for enforcement only against the insurer, in fact operated to preclude enforcement against the insurer as well. The relevance of the holding to this case, however, is illusory; in *Huffman* the insured never did become "legally responsible" to the victim, a distinction noted by the Fourth Circuit in its own analysis of North Carolina law on the subject in *Hitt v. Cox*, 737 F.2d 421, 426 (4th Cir.1984).

dence of the parties. *Id.* at § 188(2). If the situs of the negotiations and the place at which performance is to occur are in the same state, as a general proposition the local law of that state will usually be applied. *Id.* at § 188(3).

■ Here, the accident, the Gray–Speed lawsuit and ensuing default judgment all occurred in the District of Columbia. Thereafter, the conveyance of rights was negotiated and executed in the District of Columbia. The subject matter of the contract was a judgment enforceable, at the time, only in the District of Columbia. Gray is a resident of the District of Columbia, and Speed was as well between August, 1985, and August, 1986. The District of Columbia, of course, has a fundamental interest in seeing its law of contracts applied to agreements undertaken in the jurisdiction, particularly when the contract pertains to compensation for an injured citizen. Both parties to the agreement could have expected, with justification, that local law would apply to this particular assignment and release, if, indeed, they had any expectations about it at all. Thus, the District of Columbia is the jurisdiction having the more substantial contacts with all aspects of the transaction. *See Fox–Greenwald*, 452 F.2d at 1353–54; *Young v. State Farm Mut. Auto Ins. Co.*, 213 A.2d 890, 891 (D.C.App.1965); *Gagnon v. Wright*, 200 A.2d 196, 198 (D.C.App.1964). The Court concludes that, to the extent there may be a conflict between the law of the District of Columbia and that of North Carolina, District of Columbia law should control the effect to be given the Speed–Gray "assignment/release."

While there appear to be no District of Columbia cases directly on point, the District of Columbia long ago abandoned the distinction between "releases" and "covenants not to sue" in determining whether third parties can claim the benefit of the former when called upon for payment of a shared obligation. *See McKenna v. Austin*, 134 F.2d 659, 664–65, (D.C.Cir.1943). And the District of Columbia has always followed the rule that contractual undertakings are to be construed so as to give

effect to the expressed intent of the parties. *See Flack v. Laster*, 417 A.2d 393, 397 (D.C.App.1980).

■ The purpose of the instrument could not be clearer. Speed wished to rid himself of a liability he had paid Grain Dealers a premium to assume; Gray was looking to satisfy that liability from a solvent source. Both expected and intended that Gray would sue Grain Dealers for what he could get. The transaction would have been altogether pointless otherwise. The Court concludes that a District of Columbia court would hold, as most other courts have done in analogous contexts, that the purported "release" of Speed did not operate to nullify a perfected legal obligation to pay a money judgment, in the absence of fraud or collusion. *See Coblentz v. American Sur. Co. of New York*, 416 F.2d 1059, 1063 (5th Cir.1969); *Employers Mut. Liability Insurance Co. of Wisconsin v. Hendrix*, 199 F.2d 53 (4th Cir.1952); *Hodges v. State Farm Mut. Auto. Ins. Co.*, 488 F.Supp. 1057 (D.S.C.1980).

## II.

Were there a conflict between the law of the District of Columbia and of North Carolina with respect to the measure of Gray's recovery against Grain Dealers on the policy rights assigned to him, it is likely that an "interest analysis" would favor North Carolina, the jurisdiction in which Grain Dealers expected Speed would do most of his driving, i.e., the principal location of the insured risk. *See Nat. Union Fire Ins. Co. of Pittsburgh v. Binker*, 665 F.Supp. 35, 39–40 (D.D.C.1987). No such analysis is necessary, however, for, in fact, the law of the two jurisdictions is compatible. *See Muller v. Massachusetts Mut. Life Ins. Co.*, 644 F.Supp. 916, 918 (D.D.C.1986).

In the era in which it was the local court of last resort for the District of Columbia, the Court of Appeals for this Circuit stated:

It is well settled that an insurer's refusal to defend a claim within the coverage of a liability policy constitutes a breach of contract rendering the insurer liable to the insured for the losses resulting. The damages recoverable therefor

include not only the adjudicated or negotiated amount of the claim and the insured's expenses in resisting it but also any additional loss traceable to the breach.

*Siegel v. William E. Bookhultz & Sons,* 419 F.2d 720, 723 (D.C.Cir.1969) (footnote omitted).[5] In *Siegel* the court held an insurer liable for the insured's attorneys' fees, incurred in a declaratory judgment action to determine its duty to defend the insured in a damage suit the insurer had abandoned in mid-case, on the ground that the insurer's conduct had been "oppressive." The *Siegel* court asserted that it was leaving to another day and case, however, a rule for "a situation presenting a bare breach of the contract to defend." *Id.* But it appears that no such situation has since been presented to it, or to a local court of the District of Columbia, in the ensuing 19 years.[6] Surprisingly, no court in the District of Columbia—state or federal—has spoken authoritatively as to the scope of liability in such a case, and, in particular, as to whether, in the absence of an actual expenditure by its insured, an insurer can be held liable in an amount in excess of the policy limits for breach of its duty to defend or settle within those limits. Once again, therefore, this Court must anticipate how a District of Columbia court might resolve those issues (upon the assumption that there continues to be no North Carolina decision which conflicts with *Siegel* ).

The cases from elsewhere in the country are in no wise uniform or consistent. Some, as did *Siegel,* proceed on a theory that a liability insurer's failure to defend or settle a claim against its insured is a breach of contract. Others treat it as a tort. Still others find the nature of the action immaterial. Some courts allow recovery in excess of policy limits upon a showing of fault on the part of the insurer no greater than simple negligence. Others require proof of up to the equivalent of malice, i.e., dishonesty, fraud or concealment, or self-dealing. Some courts will permit no recovery in excess of policy limits unless the wronged insured is sufficiently solvent to satisfy an excess judgment himself. Others allow it on the ground the insolvency of an insured judgment debtor represents a windfall for a defaulting insurer if it operates to confine the insurer's liability to policy limits in circumstances in which it would be liable for the excess to an insured who could pay the judgment. Some courts require an insured to make actual expenditures to recover them as consequential damages in excess of policy limits. Others find the entry of a judgment alone to be sufficient consequential damage to subject the insurer to liability for it.[7] *Compare,* for example, *Green v. J.C. Penney Auto Insurance Co., Inc.,* 806 F.2d 759 (7th Cir.1986); *State Farm Mutual Automobile Insurance Co. v. Floyd,* 235 Va. 136, 366 S.E.2d 93 (1988); *Stockdale v. Jamison,* 416 Mich. 217, 330 N.W.2d 389 (1982); and *Carter v. Pioneer Mutual Casualty Co.,* 67 Ohio St.2d 146, 423 N.E.2d 188 (1981).

It is neither possible nor politic for this Court to attempt to predict the rule most likely to evolve in the courts of the District of Columbia (or North Carolina) with respect to an insurer's liability, generally, for judgments in excess of its insured's policy limits when the judgment results, in whole or part, from some culpable act or omission of the carrier. The range of choices is too

---

5. *Compare Jamestown Mutual Ins. Co. v. Nationwide Mutual Ins. Co.,* 277 N.C. 216, 176 S.E.2d 751 (1970): "It is well settled that an insurer who wrongfully refuses to defend a suit against its insured is liable to the insured for sums expended in payment or settlement of the claim, for reasonable attorneys' fees, for other expenses of defending the suit, for court costs, and for other expenses incurred because of the refusal of the insurer to defend." [Citations omitted]. 176 S.E.2d at 754.

6. Again in *dicta,* in *Sherman v. Ambassador Ins. Co.,* 670 F.2d 251, 257 (D.C.Cir.1981), the federal court of appeals declared the continuing vitality of the *Siegel* rule, and that it operates as the measure of recovery in a case in which an insurer "erroneously, although honestly" believes a claim to be beyond the scope of its coverage, and thus fails to defend.

7. The cases—some of them, at least—are collected in Annotations appearing at 20 A.L.R. 4th 23 (1983) and 36 A.L.R. 4th 922 (1985).

extreme, the public policies behind them frequently at odds with one another, and the results in particular cases clearly reflective of their peculiar facts.[8]

For present purposes the Court will regard itself bound by the *Siegel* (and *Sherman*) cases to treat Grain Dealers' inadvertent, but unjustified, failure to defend or settle Gray's lawsuit against Speed as a breach of contract, and nothing more.[9] It will apply the *Siegel/Sherman* rule of damages literally, i.e., "the adjudicated amount of the claim" ($334,000), plus "the insured's expenses in resisting it" ($0), and "any additional loss [to the insured] legally traceable to the breach" (also $0), and enter judgment for Gray against Grain Dealers for $334,000. The rule has the advantage of simplicity. It is also exceedingly harsh on the facts of this case. An insurer who "erroneously, although honestly" did no more than carelessly fail to cause an answer to a complaint against its insured to be timely filed (or, of course, to have settled the claim) before a default had been taken, becomes liable for more than thirteenfold its policy limits.

It is, therefore, this 13th day of May, 1988,

ORDERED, upon an express determination that there is no just reason for delay and an express direction therefor, that final judgment be entered in favor of Vernon Gray against Grain Dealers Mutual Insurance Company in the amount of Three Hundred and Thirty-four Thousand Dollars ($334,000.00); and it is

FURTHER ORDERED, that execution on the judgment is stayed pending completion of proceedings upon a timely appeal;[10] and it is

FURTHER ORDERED, that all further proceedings herein are stayed pending further order of this Court.

---

**8.** This Court observes that it is not open to it to request guidance from the District of Columbia Court of Appeals pursuant to D.C.Code § 11–723 (1986).

**9.** The District of Columbia Court of Appeals recognizes decisions of the U.S. Court of Appeals for the District of Columbia antedating 1971 as binding precedent. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971).

**10.** To the extent it may be necessary to an immediate appeal hereof, the Court states that this Memorandum and Order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b).