Vernon GRAY

v.

**GRAIN DEALERS MUTUAL
INSURANCE CO.,
Petitioner.**

No. 88–7125.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 6, 1989.
Decided April 4, 1989.

Ralph Boccarosse, Jr., Fairfax, Va., for petitioner.

Howard L. Siegel, Hartford, Conn., for respondent.

Before SILBERMAN, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Following a personal injury claim filed against Windell Speed by Vernon Gray, a pedestrian Speed hit while driving his car,

Grain Dealers Mutual Insurance Company breached its duty to settle on behalf of its insured, Speed. In doing so, Grain Dealers exposed itself to liability in excess of Speed's policy limits for consequential damages resulting from its breach. Speed assigned to Gray Speed's chose in action against Grain Dealers in exchange for Gray's release of Speed from liability to pay a default judgment of $334,000 entered against him. The district court awarded Gray $334,000, 684 F.Supp. 1108, and we affirm that result.

## I.

This case comes to us primarily on stipulated facts. The district court, however, made certain findings, apparently not in dispute, which supplement the stipulations. In 1985, Grain Dealers Mutual Insurance Company, an Indiana corporation, issued an automobile liability insurance policy to Windell Speed, then a North Carolina resident. The contract, mailed to Speed at his North Carolina address, lists a North Carolina agent for Grain Dealers. Subsequently, Speed moved to Washington, D.C. and in August 1985, while driving his car in Washington, D.C., struck and seriously injured Vernon Gray, a pedestrian. Speed timely reported the accident to Grain Dealers, which referred Speed to its agent in Northern Virginia, R.W. Parker. In September 1985, Gray filed suit against Speed seeking $2 million in damages. The insurance contract included a standard "duty-to-defend clause" obligating the insurer to provide legal counsel to defend or settle on behalf of Speed in the event of a lawsuit arising out of an insured risk. Speed accordingly mailed the complaint to Parker who assured Speed that he would take care of the lawsuit. Gray's attorney made several attempts to contact Parker and discuss settlement of the case. In a letter dated January 7, 1986, Gray's attorney offered to settle the case for $25,000—the policy limit. Parker did not respond to the letter.

In light of Parker's silence, Gray's attorney sought and gained a default judgment against Speed at the end of January 1986. The next month, when the district court held a hearing to ascertain Gray's damages, no one appeared for Speed. After hearing evidence on Gray's injuries and medical expenses, the court awarded him $334,000. Several months later, in April 1986, Parker sent Gray's January 7 settlement offer to Grain Dealers.

In June, Speed agreed to assign his claim against the insurance company to Gray in exchange for Gray's releasing Speed of any obligation to pay the judgment. Shortly thereafter Gray sued Grain Dealers and R.W. Parker to recover the amount of the judgment. After Gray filed his suit against Grain Dealers and Parker, Grain Dealers filed, in its own name, a "motion for relief from judgment" in the previous suit that Gray had filed against Speed. The court granted Gray's responsive motion to strike Grain Dealers' motion, on the grounds that Grain Dealers was not a party to that suit, and that the assignment released Speed from any obligation under the suit. In response to the suit filed against it, Grain Dealers asserted that it was only liable under the policy to indemnify Speed and by reason of the assignment, Speed's liability to Gray—and any liability of Grain Dealers to Speed or Gray—was extinguished. Alternatively, the company claimed it could not be held liable under North Carolina law in excess of its policy limits for only negligence, to which the company had stipulated. On cross motions for summary judgment, the district court awarded Gray the full amount of the default judgment against Grain Dealers, notwithstanding its recognition that the result was "harsh."

## II.

■ The parties disagree at the outset as to which law, North Carolina or the District of Columbia, governs the case. In a diversity case, we must apply the choice-of-law principles of the forum jurisdiction which, in this case, is the District of Columbia. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). The District, in tort or contract cases, chooses between jurisdictions by inquiring into "the relation-

ships of the two jurisdictions to the controversy, the interests involved, and whether application of foreign law would offend a strong and clearly defined local policy." *Mazza v. Mazza*, 475 F.2d 385, 391 (D.C. Cir.1973). *See also Kaiser–Georgetown Community v. Stutsman*, 491 A.2d 502, 509 (D.C.App.1985).

With respect to the interpretation of an automobile liability policy, the District adopts the

> law of the state which the parties understood was to be the principal location of the insured risk [the auto] during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties, in which event the local law of the other state will be applied.

*National Union Fire Ins. Co. v. Binker*, 665 F.Supp. 35, 40 (D.D.C.1987) (quoting The Restatement (Second) of the Conflict of Laws § 193 (1971)). In *Binker*, the court—faced with a dispute as to which state was intended to be the principal location of the automobile—declined to order summary judgment. Here, however, although the stipulated facts are skimpy, we can presume that North Carolina was the intended principal location for the automobile since Speed was, at the time the contract was made, a resident of North Carolina. Moreover, since the contract was apparently entered into in North Carolina— and includes provisions which specifically refer to North Carolina law [1]—that state's interest in the interpretation of the contract seems to us to be clearly superior to that of the District. That the accident occurred in the District (and therefore District law governs Speed's liability to Gray) is not enough to override North Carolina's superior interest in the construction of the insurance contract. *See Binker*, 665 F.Supp. at 38–39 & n. 7.

## III.

■ We therefore examine first Grain Dealers' contention that under North Carolina law, it is not liable in excess of policy limits for ordinary negligence in handling Gray's claim against Speed. If appellant is correct, then Speed had no claim in excess of policy limits against the company that could have been assigned to Gray, and the assignment would be, at least in part, a nullity.

Although North Carolina law is by no means crystal clear on the point, we think appellee has the better argument. It may well be that in North Carolina, if the insurance company actively assumes the defense of an insured, it is not liable for mere negligence in failing to gain the best settlement for the insured. In that event, a showing of bad faith may be required to recover in excess of policy limits. *Coca– Cola Bottling Co. v. Maryland Casualty Co.*, 325 F.Supp. 204, 206 (W.D.N.C.1971).

Still, the Supreme Court of North Carolina and lower courts have described the insurer's settlement duty as "to act diligently *and* in good faith." *Alford v. Textile Ins. Co.*, 248 N.C. 224, 103 S.E.2d 8, 12 (1958) (emphasis added); *Coca–Cola Bottling Co.*, 325 F.Supp. at 206; *Abernethy v. Utica Mut. Ins. Co.*, 373 F.2d 565, 568 (4th Cir.1967). It is surely impossible to characterize the company's conduct in this case as diligent. Although the North Carolina courts may wish to insulate insurance companies from liability for "honest mistakes of judgment" *Coca–Cola*, 325 F.Supp. at 206 (which might be characterized as negligent), we detect no solicitude for the insurance company that negligently fails to exercise any judgment at all. Indeed, Grain Dealers' stipulated negligence in this case may even be indistinguishable from bad faith under North Carolina law. In *Abernethy*, the Fourth Circuit heard an appeal from summary judgment granted in "a case of a flat refusal to negotiate under

---

1. Termination and nonrenewal of the contract is dictated by North Carolina law: "We will refuse to renew or continue this policy only as permitted by the laws of North Carolina." "If the law in effect in North Carolina at the time this policy is issued, renewed or continued: re- quires ... we will comply.... We will not cancel or nonrenew any types or limits of coverages to the extent that they can be ceded to the North Carolina Reinsurance Facility except for the following reasons: ... You become a nonresident of North Carolina."

circumstances that ... gave rise to an obligation to engage with *bona fides* in settlement negotiations." 373 F.2d at 569. Deciding that a jury question was presented, the court found that "the flat refusal to negotiate, under the circumstances of substantial exposure to liability, a demonstrated receptive climate for settlement and limited insurance coverage, *could have been found to show lack of good faith* in [the insurer's] exercise of its exclusive power to settle." *Id.* at 570 (emphasis added).

■ Even assuming it could be liable in excess of policy limits as a result of its behavior, Grain Dealers further argues that it is not liable *to Gray* because the judgment against Speed was not paid or shown to be payable. Appellant contends that in order to recover against the insurance company, Gray must prove that Speed would have paid the judgment against Gray, otherwise the insurance company is liable for more than its insured's true damage. Grain Dealers argues that the value of Speed's claim against the insurance company should be modified by his ability to pay the judgment to Gray. If the modification is not made, then, through the assignment-release, a silk purse has been made out of a sow's ear. Although no direct evidence was presented by either party as to Speed's net worth, his earnings, or his

intention to attempt to pay the judgment prior to the assignment and release, we could infer from the record that Speed was a man of modest means.

Under circumstances such as this, where the insured has not yet paid any of the judgment, there is a split of authority among the states as to the extent of an insurance company's liability to the assignee of its insured for a claim above the policy limit. The majority of jurisdictions adheres to the judgment rule:[2] "an entry of judgment in excess [of policy limits] alone is sufficient damage to sustain a recovery from an insurer for its breach of duty." *Carter v. Pioneer Mut. Casualty Co.*, 67 Ohio St.2d 146, 423 N.E.2d 188, 190 (1981). To be sure, not all of the states following the judgment rule have considered the case of an insolvent or bankrupt insured, which presents the most difficult challenge to the integrity of the judgment rule.[3] (But, of course, Speed was never found to be insolvent.)[4] The minority, concerned about collusion between the insured and the assignee, follows the payment rule and limits the insurance company's liability to that portion of the judgment that equals "the amount of [the insured's] assets not exempt from legal process."[5] *Stockdale v. Jamison*, 416 Mich.

**2.** Those states supporting the judgment rule are: Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Minnesota, Missouri, Montana, New Hampshire, New Mexico, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, and Utah. Annotation, *Liability Insurer's Failure to Settle*, 63 A.L.R.3d 630, 641–69 (1975 & Supp. 1986); *Torrez v. State Farm Mut. Auto Ins. Co.*, 705 F.2d 1192, 1197–1201 (10th Cir.1982).

**3.** The following states have applied the judgment rule where the insured (or his estate) was insolvent or even bankrupt: California, Florida, Indiana, Iowa, Kansas, Louisiana, Maryland, Minnesota, Montana, New Mexico, Ohio, South Carolina, and Tennessee; *but see* n. 8. Although not squarely presented with an insolvent or bankrupt insured, courts in Alabama, Delaware, Georgia, Illinois, Massachusetts, New Hampshire, Pennsylvania, Texas, and Utah have written dicta indicating that the judgment rule would be followed in those states under such circumstances. Arizona, Arkansas, Kentucky, Missouri, and Oregon endorse the judgment rule without discussing the solvency of the insured.

Annotation, *Liability Insurer's Failure to Settle*, 63 A.L.R.3d 630, 641–69 (1975 & Supp.1986).

**4.** In any event, even if Speed were to have been found insolvent, Grain Dealers would be disadvantaged by the language of the contract: "Bankruptcy or insolvency of the *covered person* shall not relieve us of any obligations under this policy."

**5.** In addition to Michigan, California, Connecticut and New York have endorsed the payment rule noting that where an insured (or his estate) is insolvent or bankrupt no damage is shown to have harmed him. Annotation, *Liability Insurer's Failure to Settle*, 63 A.L.R.3d 630, 641–69 (1975). The California courts distinguish between the case of an insured who dies penniless and then has a judgment levied against his estate (payment rule applies) and an insured who is forced into bankruptcy by a judgment (judgment rule applies). In New York, the rule varies according to the circumstances in which it is applied:

   1) where the assured pays part of the judgment or is solvent enough to do so at the time

217, 330 N.W.2d 389, 390–91 (1981). If the insurance company were to be obliged to pay more than the insured was capable of paying at the time of the assignment and release, the insurance company, it has been thought, would be charged punitive damages. *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 334 N.Y.S.2d 601, 611, 285 N.E.2d 849 (1972) (Fuld, C.J., concurring), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973). Although it is never fully articulated, a somewhat different perception of normal behavior underlies these rules. The courts appear to be in fundamental disagreement over the issue of whether or not it is proper to presume that a person will attempt to pay his debts, and therefore that a judgment against an insured, in itself, can be assumed to be good for full value.

Unfortunately, North Carolina courts have not been obliged to choose which line of authority they prefer. A court of appeals has held that an insurance company was not liable where an insured and a plaintiff (injured party) entered into a consent judgment which, by its terms, provided that it was not enforceable against the insured. *Huffman v. Peerless Ins. Co.*, 17 N.C.App. 292, 193 S.E.2d 773, 774, *cert. denied*, 283 N.C. 257, 159 S.E.2d 689 (1973). The Supreme Court, however, in *Alford v. Textile Ins. Co.*, 248 N.C. 224, 103 S.E.2d 8 (1958), said:

> If the insurer had failed to make these settlements, and judgments for greater amounts had been obtained against its insured; it would ... be liable to [the tortfeasor/insured] for such amounts as the judgments exceeded the amounts for which the insurer could have settled.... *The liability imposed on the insurer would not ... be affected or diminished by the question of solvency or insolvency of its insured.*

*Id.* 103 S.E.2d at 12. (citations omitted and emphasis added). Although dictum, that passage suggests sympathy with the policies underlying the judgment rule. Therefore we think we would be safe in concluding that, under North Carolina law, introduction of the judgment is at least *prima facie* evidence that the insured was obligated, willing, and capable of paying the judgment. It may be open to the insurer to challenge that evidence or even to show collusion but Grain Dealers produced no such evidence here.

We note, moreover, that the insurance contract states that Grain Dealers "will pay damages for bodily injury or property damage for which any covered person becomes *legally responsible* because of an auto accident." It seems rather clear to us that after the judgment but before the assignment and release, Speed was legally responsible to pay the judgment, whether or not he ever intended to pay.[6] So we conclude under North Carolina law Grain Dealers could be made liable for the whole judgment.

### IV.

■ That brings us to question whether or not the assignment and release were self-contradicting. According to the insurance company, the release nullified the assignment of the claim because the release extinguished the basis for the assignment. If so, that which Speed assigned to Gray was worthless upon transfer. This somewhat metaphysical contention is to be tested first according to D.C. law because it depends on a construction of the agreement reached between the two parties in the District. We note somewhat ruefully that there are no cases in the District squarely on point. However, many other jurisdictions have considered similar trans-

---

of the excess judgment, the judgment rule applies and he is entitled to the full amount of the excess as his damages; 2) where he was insolvent before the judgment and obtained a bankruptcy discharge after it, he is not damaged and may not recover for it; and 3) where he was insolvent or nearly insolvent prior to the judgment the jury must consider

his past, his prospects, and other economic factors and assess his damages. *Levantino v. Insurance Co. of N. Am.*, 102 Misc.2d 77, 422 N.Y.S.2d 995, 1002 (1979).

**6.** *But see Freeman v. Schmidt Real Estate & Ins.*, 755 F.2d 135 (8th Cir.1985) and *Bendall v. White*, 511 F.Supp. 793 (N.D.Ala.1981) and discussion *infra* at 11.

actions and the majority of them have allowed the transfer.[7] A few courts have taken the path urged by the appellant, and have held that a similar transaction was ineffective in passing the claim against the insurance company to the assignee. It is apparent that underlying the construction of the assignment and release made by those courts declining to uphold them is the concern—discussed in the previous portion of the opinion—about collusion between the insured and the assignee. *See, e.g., Freeman v. Schmidt Real Estate & Ins.*, 755 F.2d 135, 138–39 (8th Cir.1985) (where insurer, like insured, is no longer "legally obligated to pay" court cites fear of collusion as policy rationale for declining to give effect to assignment/release); *Bendall v. White*, 511 F.Supp. 793, 794–95 (N.D.Ala. 1981) (same).[8] That policy rationale arises not so much out of a construction of the assignment and release, but rather stems from an evaluation of the insurance company's liability under the insurance policy. As we have already concluded, North Carolina law determines liability under the insurance policy. We think it would be quite artificial therefore to allow these policy considerations to enter into our interpretation of the assignment and release. That would be so even if D.C. law reflected these anti-collusion considerations—which it does not—because the *effect* of the assignment on the insurance company must be governed by North Carolina law. *See Fox–Greenwald Sheet Metal Co. v. Markowitz Bros.*, 452 F.2d 1346, 1354 (D.C.Cir. 1971).

Accordingly, we see no reason why, under D.C. and North Carolina law, we should not construe the assignment and release to give full effect to its terms. After all, if the release of Speed extinguished the claim Speed had against the insurance company simultaneously with the assignment of the claim, that would also be true of that part of the claim Speed had against the insurance company within the policy limits. As appellee points out, appellant's argument reduces to an absurd conclusion: if the insured were to have paid the judgment in full and obtained a release from the injured party, he would have no right to proceed against the insurer for indemnification. We think appellant's self-destruct interpretation of the document can only be adopted for policy reasons quite apart from appropriate legal methods of document construc-

7. *Steedly v. London & Lancashire Ins. Co.*, 416 F.2d 259, 262 (6th Cir.1969) (assignment/release did not free insurer from liability; if insured "had satisfied judgment by making full payment ... in return for the release, [insurer] agrees that he could have then brought an action against it or have assigned this right"); *LaRotunda v. Royal Globe Ins. Co.*, 87 Ill.App.3d 446, 42 Ill.Dec. 219, 408 N.E.2d 928 (1980) (agreement not to collect against insured given in exchange for assignment of rights against insurer evidenced no collusion); *Metcalf v. Hartford Accident & Indem. Co.*, 176 Neb. 468, 126 N.W.2d 471, 475–76 (1964) (rejecting insurer's contention that consent judgment created no legal obligation to pay); *Zander v. Casualty Ins. Co.*, 259 Cal.App.2d 793, 66 Cal.Rptr. 561, 568 (1968) (settlement with insured does not release insurer because to do so penalizes insured for attempt to minimize damages); *Critz v. Farmers Ins. Group*, 230 Cal.App.2d 788, 41 Cal.Rptr. 401, 404 (1964) (assignment of chose of action in exchange for release from liability before judgment entered against insured not void against public policy because assignment's value is determined by bad faith of insurer.).

Covenants not to execute are different than releases, as the legal liability remains in force against those who have covenants, whereas a release represents total freedom from liability. However, courts have used much the same reasoning in upholding covenants/assignments as they have when considering release/assignments. *Bishop v. Crowther*, 101 Ill.App.3d 933, 57 Ill.Dec. 341, 344, 428 N.E.2d 1021, 1024 (1981) (insurer's argument that insured no longer "legally obligated to pay" judgments against him, and therefore insurer is released as well, fails because "[a]n agreement limiting execution to specific assets does not negate damages") *appeal denied*, 88 Ill.2d 549 (1982); *State Farm Mut. Auto. Ins. Co. v. Paynter*, 122 Ariz. 198, 593 P.2d 948, 950–51 (Ct.App.1979) (assignment of rights under policy and $500 in exchange for covenant not to execute future judgments against insured upheld as not "inherently fraudulent").

8. *See also Steil v. Florida Physicians' Ins. Reciprocal*, 448 So.2d 589, 592 (Fla.Dist.Ct.App.1984) (suspicion of collusion and fraud led court to deny effect to settlement agreement/assignment but, in dictum, court indicated that such an agreement may be upheld where free from taint).

tion, and therefore the judgment of the district court is

Affirmed.