622 A.2d 103

**MEDICAL MUTUAL LIABILITY INSURANCE SOCIETY OF MARYLAND**

v.

**Deborah L. EVANS.**

No. 67, Sept. Term, 1992.

Court of Appeals of Maryland.

March 29, 1993.

2

**4**

David A. Levin and Jack L. Harvey (Wharton, Levin, Ehrmantraut, Klein & Nash, all on brief) Annapolis, for petitioner.

Marvin Ellin (LaVonna L. Vice, Ellin & Baker, all on brief) Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

Occasionally cases arise in which a trial court's denial of a motion for mistrial constitutes an abuse of discretion. This is such a case. It is a claim against a liability insurer for bad faith failure to settle.

The action was brought in 1989 in the Circuit Court for Baltimore City by the respondent, Deborah L. Evans (Evans), against the petitioner, Medical Mutual Liability Insurance Society of Maryland (Med Mutual). Evans sued as the assignee of Med Mutual's insured, Clarence E. Beverly, M.D. (Beverly), an anesthesiologist. In a 1988 medical malpractice trial, Evans had obtained a jury verdict and judgment for $2.5 million against Beverly. Thereafter, Beverly's malpractice insurer, Med Mutual, paid Evans the limits of Beverly's policy of $1 million, plus interest thereon. Beverly assigned to Evans his bad faith claim against Med Mutual. One of Med Mutual's contentions before this Court is that that assignment is invalid.

The first trial of the instant action aborted by a mistrial caused by improper questioning of a plaintiff's witness by counsel for Evans. At the retrial Med Mutual again moved for a mistrial, this time based on improper cross-examination by Evans's counsel of a witness called by Med Mutual. The mistrial was denied. Our principal holding addresses that ruling. On retrial the jury verdict was in favor of Evans against Med Mutual, and judgment was entered for the entire amount by which the judgment in *Evans v. Beverly* exceeded policy limits, that is, for $1.5 million plus accumulated interest on that amount. In this Court Med Mutual also argues that this measure of damages was erroneous.

Med Mutual appealed to the Court of Special Appeals.[1] The Court of Special Appeals affirmed. *Medical Mut. Liability Ins. Soc'y v. Evans*, 91 Md.App. 421, 604 A.2d 934 (1992). This Court then granted Med Mutual's petition for certiorari which raised the three issues indicated above.

Underlying this failure to settle action is a medical malpractice claim that arose out of the following circumstances.

---

**1.** Prior to consideration of the matter by the Court of Special Appeals, Med Mutual sought certiorari from this Court. The writ was denied at that time. *See Medical Mut. Liability Ins. Soc'y v. Evans*, 323 Md. 309, 593 A.2d 668 (1991).

In 1983 Evans, then age thirty-five, was an award-winning public school teacher in Baltimore City. On September 17 of that year she entered Lutheran Hospital (Lutheran) for the removal of an IUD that had extravasated into the intraperitoneal cavity. Evans was placed under general anesthesia for the surgery. Beverly was the anesthesiologist. The IUD was located through laparoscopy, but could not be extracted through the scope, requiring that a five centimeter incision be made in the abdomen. The entire procedure required in excess of three hours. Evans had a delayed response in awakening. She was discharged from Lutheran on September 22, 1983 "in good condition," per the summary. That night Evans was admitted to Baltimore County General Hospital with focal right-sided seizures, which she described as occurring intermittently. She was discharged on October 5, 1983, clinically improved, but apparently without any determination of the cause of the condition.

Evans's condition declined. She developed a tremor in the right arm and hand, with numbness and weakness. Her thinking processes and ability to concentrate were impaired. She could no longer teach school and, for Social Security purposes, she was determined to be totally disabled.

Claim was made by Evans against Beverly in Health Claims Arbitration.[2] In the opinion of medical experts who were expected to testify for Evans, she had suffered a brain injury caused by a lack of oxygen in the course of the surgery at Lutheran. That hypoxia, in turn, was said to be due to Beverly's failure adequately to monitor Evans.

Beverly holds degrees in pharmacy and in medicine. Upon completion of his medical residency in 1961, he joined the staff of a hospital in Newark, New Jersey where he continuously practiced anesthesiology until October 4, 1975.

---

**2.** As to the Health Claims Arbitration process, see Md.Code (1974, 1989 Repl.Vol.), §§ 3–2A–01 through 3–2A–09 of the Courts and Judicial Proceedings Article (CJ).

On that date he accidently fell in the operating room and struck the back of his head. He was hospitalized for one month. Complications of the injury included convulsion and a left paralysis. Following a prolonged period of recuperation and rehabilitative therapy, Beverly worked for two and one-half years on a research project. Thereafter, he came to Baltimore to study for a master's degree at the School of Public Health at Johns Hopkins University. Beverly began drinking heavily, but, recognizing his problem, he voluntarily admitted himself to a full-time treatment program that he successfully completed. He returned to his studies and obtained his master's degree in 1982. In October of that year, he applied for privileges in anesthesiology at Lutheran. Courtesy provisional privileges at that hospital were granted in May 1983. Lutheran, in granting privileges, was aware of Beverly's prior head injury and the hiatus in his practice of medicine.

Beverly had also been accorded privileges at The Wyman Park Medical Center (Wyman Park). A patient to whom Beverly had administered anesthesia at Wyman Park on January 18, 1983, died on February 11, 1983, after having been in a coma for twenty-five days. A malpractice claim was asserted against Beverly on behalf of the patient's family through the same attorney who represents Evans. This wrongful death claim has been referred to in the instant matter as the *Tinkler* claim. The *Tinkler* plaintiffs alleged that Beverly had inserted the endotracheal tube into the patient's esophagus, causing brain damage and ultimately death. At some point during the pendency of *Tinkler*, Beverly acknowledged to his counsel and insurer that he had made the mistake, as alleged. The claim was settled, without a court trial, at or within policy limits.

Beginning in 1984 and continuing through April 23, 1986, Beverly spent the cold weather months in Barbados where he worked as an anesthesiologist at Queen Elizabeth Hospital in Bridgetown.

Counsel for Evans was aware of Beverly's 1975 head injury and of the eight-year hiatus in his practicing anesthesiology. On behalf of Evans and of the *Tinkler* clients, counsel sought an injunction against Beverly's practice of medicine in Maryland. The matter ultimately was presented to the Commission on Medical Discipline (the Commission) which, in May 1986, suspended Beverly, pending a determination of his competency. These proceedings were prominently reported in the local press.

Roy L. Mason, Esq. (Mason), whom Med Mutual had engaged to represent Beverly in the Evans malpractice action, was engaged by Med Mutual to represent Beverly in seeking reinstatement of his medical license. Med Mutual caused Beverly to be examined in August 1986 in the Department of Neurology at the Yale University School of Medicine. This examination revealed no evidence of brain impairment or cognitive disorder. The Commission also caused Beverly to be examined by Dr. Jonas Rappaport, who found Beverly physically and mentally capable of practicing.

The hearing of the Evans claim before a panel in Health Claims Arbitration began in July 1986. Proceedings were conducted at intervals, and the hearing was not concluded until November 1986. Going into the hearing, Evans's demand was $500,000 and the counter-offer was $200,000. Medical experts for the defense apparently testified that there was no evidence of a hypoxic event, that focal brain damage could not be attributed to hypoxia, and that there were other explanations, *e.g.*, prescribed medications, for some of Evans's symptoms. The panel awarded Evans $500,000.

Evans rejected the award[3] and filed a complaint in the Circuit Court for Baltimore City seeking a jury trial of the malpractice claim. Evans set her demand at $1 million. Beverly, on the other hand, moved to set aside the arbitra-

---

3. *See* CJ § 3–2A–06(a).

tors' award.[4] He was successful.[5] The effect of vacating the award was that the trial of the malpractice case proceeded as if there had been no award. Md.Code (1974, 1989 Repl.Vol.), § 3-2A-06(c) of the Courts and Judicial Proceedings Article (CJ). Thus, the jury in the malpractice action was not instructed to presume that the award was correct. CJ § 3-2A-06(d).

During pendency of the malpractice action in circuit court, Beverly admitted to his counsel, Mason, and to Med Mutual that he had a disability income policy with The Paul Revere Life Insurance Company (Paul Revere) on which he had been collecting benefits at the rate of approximately $36,000 per year and that he had continued to collect those disability benefits following his resumption of the practice of anesthesiology at Lutheran and at Wyman Park.

This revelation caused Med Mutual to consult the late David M. Buffington, Esq. (Buffington), who advised in July 1987 as follows:

1. Until Beverly corrected the fraud on Paul Revere, Mason's efforts to have Beverly's medical license reinstated must be discontinued and Med Mutual could terminate the payment of fees for those services.

2. Med Mutual could not disclaim coverage, because the fraud affected Paul Revere, not Med Mutual.

3. Mason was not obliged to discontinue representing Beverly in the malpractice action, unless Beverly should

---

**4.** *See* CJ § 3-2A-06(c).

**5.** The circuit court ruled that the health care provider member of the panel had the appearance of bias in favor of Evans. The health care representative on the panel was a defendant in a claim brought by a claimant who was also represented by counsel for Evans, but the health care panel member had not disclosed that fact. Beverly's theory, adopted by the circuit court, was that the health care panel member might favor Evans in the arbitration in exchange for favorable consideration by Evans's counsel in the malpractice action against the panel member. We intimate no opinion on the validity of this theory.

commit perjury in connection with further proceedings in that case.

4. Beverly's assets in Barbados would be subject to seizure to satisfy any excess judgment, if suit based on an American judgment were filed there, resulting in a judgment under the law of Barbados.[6]

Mason, independently, also obtained a legal ethics opinion from Professor William Weston of the University of Baltimore School of Law. Based on that opinion, Mason concluded that he should withdraw from representation of Beverly in the malpractice action, as well as before the Commission. The circuit court, on October 30, 1987, authorized Mason's withdrawal of appearance. Med Mutual engaged H. Kenneth Armstrong, Esq. (Armstrong) to assume Beverly's representation in *Evans v. Beverly*.

The change of counsel resulted in a postponement of trial from the then scheduled date of November 9, 1987, to January 18, 1988. During the period of transition between defense counsel, counsel for Evans, on November 2, 1987, communicated a $500,000 demand to Mason, whose office, in turn, communicated the offer to Med Mutual. Internal claims procedures at Med Mutual required authorization by the claims committee, a group that included physicians, to pay Evans's demand. Before any action was taken on Evans's demand, it was effectively withdrawn on November 10, 1987, by her demand for policy limits, if not less than $1 million. That offer would expire by its terms after December 1, 1987.

---

**6.** Buffington's opinion letter, addressed to a claims supervisor at Med Mutual, opens by saying: "You have asked me to address four questions...." The fourth question addressed is evidence that Med Mutual contemplated an excess verdict in *Evans v. Beverly*. Buffington's testimony was perpetuated by video deposition which was played for the jury in the subject case. No transcript was prepared by the court reporter and the videotape has not been transmitted as part of the record. It appears from questioning, testimony of other witnesses, and argument of counsel that Buffington testified on deposition that, in substance, he added the fourth question on his own initiative.

On November 25, 1987, Med Mutual, through Armstrong, counter-offered $250,000.[7] That offer by its terms expired November 27 at 10:00 a.m., the scheduled starting time for a re-deposition of Beverly by the plaintiff.

In November 1987, Evans was unaware of the fact that Beverly was collecting disability benefits from Paul Revere, and that information was not elicited at the re-deposition of Beverly in late November. Indeed, *Evans v. Beverly* was tried to judgment without that information coming to light.[8]

During this same period, Beverly, on the recommendation of Mason, had retained Stuart M. Salsbury, Esq. (Salsbury) as personal counsel. Salsbury is a former president of the Maryland Trial Lawyers Association. As early as November 2, 1987, he began a campaign of letter writing and telephone calls urging Med Mutual and insurance counsel for Beverly to settle the Evans case at policy limits. During the trial, Beverly personally wrote letters to Armstrong and Med Mutual, imploring them to settle the case within policy limits.

On December 21, 1987, Med Mutual offered Evans $350,-000, which was declined.[9]

As the January 18, 1988, trial date approached, evaluation of *Evans v. Beverly* involved factors favoring the plaintiff and the defendant. Those favoring the plaintiff included the following:

—Evans would get to the jury on liability.

---

**7.** That offer was allocated $200,000 on behalf of Beverly and $50,000 on behalf of a co-defendant, the surgeon who removed the IUD. In *Evans v. Beverly,* the jury found in favor of that co-defendant.

**8.** Evans first learned that Beverly was collecting disability benefits during the pendency of the instant action through the answer by Med Mutual, filed on February 12, 1990, to an interrogatory propounded by Evans inquiring why Mason had withdrawn his appearance for Beverly, who, meanwhile, had waived his privilege.

**9.** This offer was for settlement of all claims against Beverly and the co-defendant.

—There was evidence that Evans was brain damaged and permanently disabled. This evidence included the opinion of an assistant professor of neurological surgery at the University of Maryland who examined Evans at the request of the defense and who found that her "neurological examination is obviously abnormal." [10]

—An economist would testify that Evans's past and future lifetime economic loss was approximately $600,000.

To the foregoing factors should be added those emphasized by Salsbury in November 1987 when opining to Med Mutual that there was "a great likelihood" that the verdict would exceed $1 million. Salsbury's reasons were:

"1. That the case was lost at the Health Claims Arbitration level, a fact which puts in serious doubt the defensibility of the case;

"2. That the plaintiff's counsel is one of the most skilled malpractice attorneys in the state of Maryland;

"3. At the time of the happening, there is a serious question as to whether or not Dr. Beverly was disabled; a fact that, if established, would almost assure a plaintiff verdict;

"4. That there is certain information pertaining to the question of a disability at the time of the incident, which plaintiff's counsel is not aware of at this time but could gain knowledge of through testimony at trial;

"5. That if this information becomes known at trial, it will impugn seriously on Dr. Beverly's credibility in this case and will have the effect of dramatically inflating the damages;

"6. That Dr. Beverly, if asked the proper questions at trial would answer them truthfully and disclose this information;

---

**10.** That expert also found it "markedly difficult, however, to pinpoint an exact anatomical location of the lesion" which would produce the "[m]emory loss, difficulty with reading comprehension, tremors of the right upper extremity, bilateral cerebellar signs and convulsions."

"7. That previous defense counsel have recognized the damage that could be done by disclosure of this information and as a result feel that settlement would be in the best interests of Dr. Beverly."

Factors favoring the defense, or at least tending to support an evaluation that a plaintiff's verdict would be within policy limits, included the following:

—It was anticipated that the circuit court would preclude evidence of the *Tinkler* claim, of Beverly's suspension by the Commission, and of Beverly's treatment for alcoholism. The circuit court in *Evans v. Beverly* did, in fact, grant the defense motion in limine as to those three categories.

—Unlike his admission of fault in *Tinkler,* Beverly would testify that his conduct conformed to medical standards.

—The opinions of experts to be called by the defense would support that Beverly was not negligent. These experts included one who had not testified in Health Claims Arbitration and whose authoritative work had been relied upon by experts for Evans.

—The verdict in health claims arbitration had been at fifty percent of limits.

—Neither Mason nor Armstrong, both experienced defense counsel, had recommended payment of policy limits. Mason had recommended an offer of $200,000 and had evaluated the maximum jury verdict to fall between $750,-000 and $900,000. Armstrong testified that "[w]e believed that we had a good defense, and when you have a good defense you don't pay the top dollar, which was $500,000, so you make an offer that is lower than that."

Med Mutual's final settlement offer was made in the alternative on January 11, 1988. Evans could either accept a lump sum of $400,000 before trial or Evans could go to trial and verdict under a high-low agreement of $400,000/$1,000,000. If there were a defendant's verdict, or a verdict for the plaintiff of less than $400,000, Evans would be paid $400,000. If a verdict fell in the range of $400,000 to $1 million, Evans would be paid the amount of the verdict. If

the verdict exceeded $1 million, Evans would be paid $1 million in full satisfaction of all claims. The offer was not accepted.

*Evans v. Beverly* proceeded to jury trial as scheduled, and on February 4, 1988, the jury returned a verdict of $2.5 million in favor of Evans against Beverly. Thereafter Evans obtained an assignment from Beverly of his claim against Med Mutual for bad faith failure to settle, and the action now before us was filed. Beverly had moved to Barbados prior to trial, and did not testify in this case.

Additional facts will be stated later in this opinion to the extent necessary to consider the issues raised on certiorari.

I

Med Mutual asks us to review the holding by the Court of Special Appeals that the circuit court did not abuse its discretion in denying Med Mutual's motion for mistrial. Relevant to that review is an episode that occurred in December 1990 at the aborted initial trial before Judge David B. Mitchell and a jury.

Evans had called as a witness George W. White, Jr., Esq. (White), a most experienced trial lawyer and former president of the Maryland Trial Lawyers Association. Evans sought to qualify White as an expert on whether or not an insurer acted in bad faith, but Judge Mitchell would not permit White to express an opinion on the ultimate question. In the conference at the bench involving that ruling, Evans's counsel said to the court: "I feel, most respectfully, your Honor, that your ruling is not only incorrect, it's prejudicial and it may well cost the Plaintiff a fair trial...."

The resumed direct examination of White elicited that thirty years earlier he had represented insurance companies, that, in that capacity, he had handled approximately one dozen cases where the difference between good and bad faith came into play, and that the analysis of that aspect of evaluating a file had not changed over the years. The next question was:

"And, Mr. White, insofar as your experience is concerned regarding Medical Mutual Insurance Company, did you not so long ago sue Medical Mutual for bad faith involving the case of Walker Robinson?"

A defense objection was sustained, and, at the bench, a motion for mistrial was made. Additional colloquy and testimony from White, out of the presence of the jury, developed that *Robinson* involved a judgment entered jointly against a physician and the physician's professional association. Although the judgment exceeded the physician's individual limits, Med Mutual ultimately determined that the combined coverages of both defendants, as separate insureds, exceeded the judgment. Evans's counsel explained to Judge Mitchell that the question was based on information conveyed to him from Salsbury, who had represented the physician.[11] Med Mutual's counsel argued that the question propounded to White was "like asking a witness on the stand 'Have you ever been arrested for murder?' when he is on trial for murder." Judge Mitchell granted the motion for mistrial, ruling: "I do not believe that it can be corrected. I do not believe that this Defendant will have an opportunity to fairly present its case."

Retrial began on February 4, 1991, the third anniversary of the $2.5 million verdict. Judge Mitchell again presided, with a jury. The jury consisted of eleven women and one man. Ten of the female jurors were forty years of age or younger. Of those ten, six were single and in their twenties or thirties. The trial consumed ten days from jury selection to verdict. The jury retired at 3:30 p.m. on the eighth day and rendered its verdict at 4:18 p.m. on the tenth day.

The subject motion for mistrial was made on the seventh and last day of testimony. Kenneth Robert Phillips (Phil-

---

11. During the extended colloquy, Evans's counsel arranged for Salsbury to come to the courtroom where he was proffered as a witness. The court, however, declined to hear testimony from Salsbury on that point.

lips) was called as a witness by Med Mutual. He had been acting claims manager for Med Mutual during the settlement negotiations in *Evans v. Beverly.* The claims manager's position is next to the top in a four-tiered organizational structure for handling claims. On the bottom tier are the claims adjusters. The adjuster on the Evans claim was Patricia Fulk (Fulk). Evans had opened her case by calling Fulk as a witness, whose testimony extended over the first three days of trial. Above adjusters in the structure are claims supervisors. The supervisor in this matter was Wanda Blizzard whom neither party called as a witness. Phillips managed the claims department, but he was subject to the authority of the claims committee.

The cross-examination of Phillips opened as follows:

"Q: Mr. Phillips, you and I go back a long way, don't we?

"A: Yes, sir, back to when my hair was brown and not gray.

"Q: And I didn't have any gray either in those days, did I?

"A: No.

"Q: Would it be fair to say, sir, that you and I have had some battles over the years, haven't we?

"A: Many.

"Q: Many. And with regard to listening to lawyers, and this is in reference to the direct examination of the method in the past that you relied upon in order to evaluate a case, first let me ask this question: Would it be fair to say that your testimony here today is completely free of any bias or possible resentment or irritation toward me?

"A: Yes, sir.

"Q: Did I not, Mr. Phillips, many years ago, before the Beverly case, call you up involving a case—where suit was brought, where you were the claims manager—of a young woman who claimed that her reproductive organs were removed over at Bon Secours Hospital without her

permission, she was 28 years old, took out her ovaries, her uterus?

"[MED MUTUAL'S COUNSEL]: Objection.

"[EVANS'S COUNSEL]: Your Honor, this—

"THE COURT: Overruled.

"Q: And a suit was filed and I called you up, sir, and you said what, asked me what was the demand, and I said the client has advised me she will accept $300,000, and was your response, sir, did you say $23,000? You remember that episode, don't you?

"A: I remember the case. I don't remember the $23,-000 figure.

"Q: And, Mr. Phillips, the jury down the hall here—

"[MED MUTUAL'S COUNSEL]: Objection.

"THE COURT: Overruled.

"Q: —returned a million four hundred thousand dollars, or more than four hundred thousand dollars more than the doctor's coverage. You remember that, don't you?

"A: Yes, I did.

"Q: And as it turned out, the claim that that doctor assigned to my client, the same thing that the doctor in this case assigned to Mrs. Evans, the right to sue, and you subsequently paid the additional money.

"[MED MUTUAL'S COUNSEL]: Objection.

"THE COURT: Approach the bench.

"(Counsel approached the bench and the following ensued:)

"[MED MUTUAL'S COUNSEL]: I move for a mistrial."

In colloquy at the bench, Evans's counsel maintained that the line of questioning was appropriate to demonstrate bias on the part of Phillips against counsel personally. The case referred to by Evans's counsel was *Thimatariga v. Chambers.* Uncontradicted testimony elicited from Phillips, out of the presence of the jury, established that the malpractice

claim in *Chambers* resulted in a verdict in excess of policy limits, that the case was settled for a payment of $300,000 or $350,000 in excess of limits, and that there was never any adjudication with respect to bad faith in the handling of the case.[12] Med Mutual's counsel pressed for a mistrial.

Judge Mitchell denied the motion for mistrial. He instructed Evans's counsel not to refer to any aspects in *Chambers* relating to bad faith. The court observed that "[t]he suggestion that there was a bad faith suit and then a settlement of that matter may have a greater prejudicial impact than its probative force." Judge Mitchell distinguished the subject motion for mistrial from that which occurred at the earlier trial on the ground that "[t]here a misstatement of the fact that was highly prejudicial was put in the record," whereas "[h]ere in this instance I rely upon the actuality of litigation." Judge Mitchell further recognized that the *Chambers* bad faith litigation never reached final judgment. He again observed:

> "However, when you make a comment to the jury by way of your question that we were engaged in bad faith litigation, it has a greater prejudicial effect because this jury is going to have to decide that exact same issue. The fact that they may have been guilty of bad faith litigation by a jury or Court determination or that they settled the claim of such a suit does not pour over to indicate that they are guilty in this incident; however, the effect of that is to suggest to the jury that that is the case."

Judge Mitchell permitted counsel to question as to bias, and the judge gave the jury a cautionary instruction.[13]

---

**12.** *Thimatariga v. Chambers* is reported at 46 Md.App. 260, 416 A.2d 1326, *cert. denied,* 288 Md. 744 (1980). The jury verdict was $1.5 million, which was reduced by the trial judge to $1.2 million. *Id.* at 262, 416 A.2d at 1328.

**13.** The instruction was as follows:

"Ladies and Gentlemen of the Jury, it will be your responsibility to judge this case fairly and impartially by giving each party the benefit of a fair trial. In doing that, you will assess the evidence in

Judge Mitchell had occasion to revisit the subject ruling in his memorandum opinion denying Med Mutual's motion for a new trial. There he elaborated on the bias basis for his ruling, saying:

"Trial counsel for Evans attempted to show through cross-examination that Phillips was biased against him and that this bias affected his professional judgment on the merits of the claim of Mrs. Evans. Counsel's vehicle for this was the prior dealings between the witness and him in which counsel had been successful in obtaining money in excess of the limits of another physician in another case. His desire was to show that the witness still 'smarted' from the event, and consequently, he sought to extract a measure of revenge, if you will, upon the future clients of Plaintiff's trial counsel."

The earlier grant of a mistrial based on the examination of White was again distinguished on the ground that there the question to White "made a reference to something that in fact had never occurred."

 Whether to order a mistrial rests in the discretion of the trial judge, and appellate review of the denial of the motion is limited to whether there has been an abuse of discretion. *State v. Hawkins*, 326 Md. 270, 277, 604 A.2d 489, 493 (1992). The question is one of prejudice. *Rainville v. State*, 328 Md. 398, 408, 614 A.2d 949, 953 (1992); *Hawkins*, 326 Md. at 276, 604 A.2d at 492. Where the motion is denied and the trial judge gives a curative instruction, we must determine " 'whether the evidence was so prejudicial that it denied the defendant a fair trial;' that is, whether 'the damage in the form of prejudice to the defendant transcended the curative effect of the instruction.' "

---

this case and determine the facts with regard to this case based on what has been presented to you as to this case.

"We implore you to recall your oath and your responsibilities to assess what did or did not, what has or what has not, what was or was not the facts in this case based on the evidence presented and do that with impartiality, devoid of prejudice, and with fairness to both sides."

*Rainville,* 328 Md. at 408, 614 A.2d at 953–54 (quoting *Kosmas v. State,* 316 Md. 587, 594, 560 A.2d 1137, 1141 (1989)). Discretion was abused by denying a mistrial where the mother of a victim in a child sexual abuse prosecution referred to the accused's being in jail for what the accused had done to another of the witness's children, *Rainville,* 328 Md. 398, 614 A.2d 949, and where a witness for the State in a murder prosecution referred to the defendant's negative response when asked whether he would take a lie detector test, *Kosmas,* 316 Md. 587, 560 A.2d 1137.

█ Here, after counsel obtained the general acknowledgement that he and Phillips had had many battles over the years, counsel moved directly to questions which embodied, as fact, that Med Mutual had paid approximately $400,-000 on an assigned bad faith failure to settle claim where the underlying malpractice had been the nonconsensual removal of a young woman's ovaries and uterus. Assuming that the trial judge would give leeway to explore the particulars of some of the "battles," the question was clearly improper by referring to inadmissible prior "bad acts."

Judge Cole, writing for this Court in *State v. Cox,* 298 Md. 173, 468 A.2d 319 (1983), explained that "[w]e have allowed [inquiry about prior bad acts] to be conducted when the trial judge is satisfied that there is a reasonable basis for the question, that the primary purpose of the inquiry is not to harass or embarrass the witness, and that there is little likelihood of obscuring the issue on trial." *Id.* at 179, 468 A.2d at 322. The questioning of Phillips fails in all respects.

There was no basis for referring to Med Mutual's payment of "the additional money" in *Chambers* on·an assigned claim of bad faith failure to settle when the fact of bad faith had never been adjudicated. *Cox,* citing, *inter alia, Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982), reiterated that "[w]e have also been steadfast in holding that mere accusations of crime or miscon-

duct may not be used to impeach." 298 Md. at 179, 468 A.2d at 322.

*Martens Chevrolet* was an action by the buyer of an automobile dealership against the selling corporation and its principal owners alleging, *inter alia*, deceit. We reversed a judgment for the defendants, based on a jury verdict, on the deceit claim because of improper cross-examination by the defendants of a nonparty witness for the buyer. That witness was asked: " 'You have been charged with deceit by the Chrysler Company, haven't you?' " *Martens Chevrolet*, 292 Md. at 339, 439 A.2d at 540. The "charge" of deceit was an allegation in a then pending, but undecided, civil lawsuit. Quoting from *Bonaparte v. Thayer*, 95 Md. 548, 559, 52 A. 496, 499 (1902), we said that " '[w]hatever may be the law elsewhere, the courts of this State have always recognized the distinction ... between actual misconduct, itself, and the charge of misconduct, and have excluded the latter.' " *Martens Chevrolet*, 292 Md. at 340, 439 A.2d at 541.

Judge Mitchell's instinctive reaction to the prejudicial effect of the questioning was entirely correct. Many lay persons would consider that, if Med Mutual refused to protect another insured by failing, in bad faith, to settle within policy limits in a different case, it would be more likely that Med Mutual failed in bad faith to protect Beverly's interest. Thus, to say that no bad faith claim was filed in *Robinson*, but that such a claim was filed in *Chambers*, ignores the real point that the accusation in *Chambers* is irrelevant *and* prejudicial.

Nor does it appear that counsel had any reasonable expectation that Phillips would admit to a bad faith failure to have settled *Chambers*. Phillips did not confirm an offer to pay $23,000 in *Chambers*. Whatever the actual facts in *Chambers* might have been, Evans would not be permitted directly to prove those unacknowledged, collateral matters. *Cox*, 298 Md. at 179, 468 A.2d at 322. Under these circumstances, to embellish the improper "bad acts" questioning by stating that Phillips had valued the unauthorized remov-

al of a young woman's ovaries and uterus at $23,000 strongly suggests, if it does not compel, a conclusion that the primary purpose of the questioning was to embarrass and harass the witness. Given the fact that a substantial segment of the jury in the instant matter was composed of women of child-bearing age, the likelihood is great that Med Mutual was additionally prejudiced by the suggestion of a parsimonious and insensitive reaction to an involuntary and irreversible sterilization of a young woman.

The real issue in the instant matter was whether Med Mutual, in *Evans v. Beverly,* had made " 'an informed judgment arrived at in good faith after reasonably diligent investigation.' " *State Farm Mut. Auto. Ins. Co. v. White,* 248 Md. 324, 330, 236 A.2d 269, 272 (1967) (quoting *Radio Taxi Serv., Inc. v. Lincoln Mut. Ins. Co.,* 31 N.J. 299, 157 A.2d 319, 327 (1960)). Reference to the purported, but dramatic, facts of *Chambers* served to obscure the real issue. Even when one's attention is confined to the facts relevant to the valuation of *Evans v. Beverly,* the instant failure to settle case was a difficult one for any jury. There were references throughout the testimony to the wrongful death in *Tinkler,* to the suspension of Beverly's medical license, and to Beverly's bout with alcoholism. Exclusion of these real life facts as irrelevant in the trial of *Evans v. Beverly* must have presented many of the jurors with a totally unfamiliar analytical process. Further complicating the jury's task was the evidence about Beverly's disability benefits from Paul Revere. If Beverly was disabled, as Evans, at least at times, contended, that fact would bear adversely on Med Mutual's handling of the defense. On the other hand, if Beverly was defrauding Paul Revere, as Med Mutual contended, the jury would once again be required to apply concepts of relevancy in measuring Med Mutual's approach to the defense of the Evans claim.

When considering whether to grant a mistrial in the instant matter, Judge Mitchell had ample indicia that this jury had difficulty in keeping focused on that which was

relevant to the issue to be decided. In the course of the trial this jury sent twenty-two notes asking questions. We present a sampling.

On the fourth day of trial, Evans called William Ryan as an expert on the handling of claims by liability insurers. The jury sent a note asking Mr. Ryan:

"Approximately what percent of malpractice lawsuits are settled out of court? Of those settled out of court, approximately what percent are settled for 50% or less of the policy limits? Of those settled in court, approximately what percent are given excess verdicts?"

A note presenting substantially the same question was sent for answer by Armstrong, who testified before Phillips did, on the seventh day of trial.

The jury also wanted Armstrong to tell them whether "[i]f Dr. Beverly were to re-enter the country *today,* would, in your opinion, he be arrested for mail fraud?" Earlier the jury had sent a note to Judge Mitchell and/or to plaintiff's or defendant's counsel. It read:

"Considering all the various people who now know that Dr. Beverly has committed mail fraud, i.e. Armstrong, Mason, Levin, Ellen [sic] and now Judge Mitchell—why has there been NO [underscored three times] action in prosecuting Dr. Beverly for mail fraud, especially now when there are documents supporting the conclusion that there has *definitely* been mail fraud, by Dr. Beverly?"

In his direct examination, Phillips had testified that the information about Beverly and Paul Revere did not play any part in his determination of what to do with the Evans claim "because that was an issue that was outside of the medical and legal issues in the case." The jury sent the following questions for answer by Phillips:

"Are you saying that if you knew a person *personally,* who happened to be insured by your company—and you knew for *a fact* that person who was making a claim to your company, was a wife or child abuser, you would *not* offer this information for their insurance file?

"Why is this *totally* irrelevant as far as general information for his/her file?

Don't you feel, if this info came out in a jury trial it could be detrimental to his/her case?"

██ The opening of the cross-examination of Phillips was a planned approach. Counsel for Evans had in the courtroom the file in *Chambers* and, when the subject motion was made, invited Judge Mitchell to peruse the file. Even the most intense and dedicated advocate would recognize the likely inadmissibility of, and the potential for a mistrial caused by a reference to, an allegedly bad faith failure to settle in a collateral matter. To permit counsel to obtain a ruling on whether proposed proof will be admitted, and in order to avoid mistrials, contemporary practice recognizes the motion *in limine*. *See Prout v. State,* 311 Md. 348, 356, 535 A.2d 445, 449 (1988) ("[T]he real purpose of a motion *in limine* is to give the trial judge notice of the movant's position so as to avoid the introduction of damaging evidence which may irretrievably infect the fairness of the trial."); *Turgut v. Levine,* 79 Md.App. 279, 286, 556 A.2d 720, 723 (1989); *Hickman v. State,* 76 Md.App. 111, 114–15, 543 A.2d 870, 872 (1988). Here, the motion for mistrial came on the seventh and the last day of testimony. No one wants to waste the investment of parties, witnesses, counsel, jurors, and trial court by having the proceedings result in a mistrial. The way to avoid that result is the motion *in limine,* particularly where, as here, an earlier trial had aborted because of improper questioning by the same attorney.

Under all of the circumstances reviewed above, we hold that the prejudice resulting from the improper cross-examination of Phillips transcended the curative instruction, and that the trial court abused its discretion in denying the motion for a mistrial.

## II

We turn now to issues, raised by Med Mutual, which will recur on retrial. The first of these is Med Mutual's frontal

assault on the Maryland law as to the measure of damages in bad faith failure to settle cases.

██ Present Maryland law, and the majority rule, is that the measure of damages in a bad faith failure to settle case is the amount by which the judgment rendered in the underlying action exceeds the amount of insurance coverage. Med Mutual urges us to adopt the minority view, termed the Michigan Rule, which limits the amount of recovery on a bad faith failure to settle action to the amount of the insured's assets not exempt from legal process. *Frankenmuth Mut. Ins. Co. v. Keeley,* 433 Mich. 525, 447 N.W.2d 691, 707–09 (1989) (*Frankenmuth I*) (Levin, J., dissenting) (dissent adopted as majority in *Frankenmuth Mut. Ins. Co. v. Keeley,* 436 Mich. 372, 461 N.W.2d 666 (1990) (*Frankenmuth II* )).

The majority rule has been recognized by this Court since *Sweeten v. National Mut. Ins. Co.,* 233 Md. 52, 194 A.2d 817 (1963). The issue was whether the complaint by the insured's insolvent estate must allege that the estate had paid, or was able to pay, the excess judgment. As phrased by this Court: "The question ... is whether the existence of an unpaid judgment will suffice to show injury and damage in the legal sense." *Id.* at 56, 194 A.2d at 818. We held that the mere existence of the unpaid judgment constituted legal injury such that the action could be maintained. *Id.* at 57, 194 A.2d at 819.

Maryland law was applied in *Lee v. Nationwide Mut. Ins. Co.,* 286 F.2d 295 (4th Cir.1961), where the excess judgment far exceeded the assets of the deceased insured's estate. The Fourth Circuit ruled that "the extant, unpaid judgments [are] injuries in themselves, their overburden measuring the pecuniary damages." *Id.* at 298.

Most recently the Court of Special Appeals in *State Farm Mut. Auto. Ins. Co. v. Schlossberg,* 82 Md.App. 45, 570 A.2d 328, *cert. denied,* 320 Md. 222, 577 A.2d 50 (1990), correctly held:

"The proper method of assessing damages ... is the difference between the insurance coverage and the jury verdict in the underlying case.... Since liability has been decided ... and since the damages to be awarded in this case are a fixed sum determined by mathematical computation, there is no fact issue for a jury to decide." *Id.* at 63, 570 A.2d at 336–37. In accordance with *Schlossberg,* Judge Mitchell in the instant matter simply had the jury determine whether it found for the plaintiff or the defendant, and then the circuit court applied the legal measure of damages to the uncontradicted facts.

Recent cases applying the majority rule include: *Consolidated Am. Ins. Co. v. Mike Soper Marine Servs.,* 951 F.2d 186 (9th Cir.1991) (applying California law); *Comunale v. Traders & Gen. Ins. Co.,* 50 Cal.2d 654, 328 P.2d 198 (1958); *Kelly v. Farmers Ins. Exchange,* 194 Cal.App.3d 1, 239 Cal.Rptr. 259 (1987); *Purdy v. Pacific Auto. Ins. Co.,* 157 Cal.App.3d 59, 203 Cal.Rptr. 524 (1984); *Wolfberg v. Prudence Mut. Casualty Co.,* 98 Ill.App.2d 190, 240 N.E.2d 176 (1968); *DiBlasi v. Aetna Life & Casualty Ins. Co.,* 147 A.D.2d 93, 542 N.Y.S.2d 187 (1989); *Carter v. Pioneer Mut. Casualty Co.,* 67 Ohio St.2d 146, 423 N.E.2d 188 (1981); *Stumpf v. Continental Casualty Co.,* 102 Or.App. 302, 794 P.2d 1228 (1990); *Spray v. Continental Casualty Co.,* 86 Or.App. 156, 739 P.2d 40, *review denied,* 304 Or. 185, 743 P.2d 735 (1987); *Mello v. General Ins. Co.,* 525 A.2d 1304 (R.I.1987); *Trotter v. State Farm Mut. Auto. Ins. Co.,* 297 S.C. 465, 377 S.E.2d 343 (1988); *Myers v. Ambassador Ins. Co.,* 146 Vt. 552, 508 A.2d 689 (1986).

Med Mutual submits that the case at hand demonstrates that the minority rule is the better rule. The judgment entered in this case, with interest from the time of the judgment in *Evans v. Beverly,* is $1,787,671.23. Based on the underlying judgment, Evans executed on Beverly's bank account in Maryland and realized only $1,500. We shall assume that Beverly's assets, including any he may have in Barbados and including the present value of income, net of exemptions from execution, that he may earn in the future,

are insignificant in relation to the excess judgment and its accumulating interest. Med Mutual's position is that the only economic harm that Beverly will actually suffer from any breach of duty by his insurer and from the resultant excess judgment cannot be greater than the amount that Evans would probably realize from Beverly personally.

Some proponents of the minority approach to damages in failure to settle cases would also have the underlying judgment fully discharged by the insurer's payment of the amount determined by the insured's net assets. *See* R. Keeton & A. Widiss, *Insurance Law* § 7.8(4), at 903 (1988). Neither the Michigan court, *see Frankenmuth I*, 433 Mich. at 562 n. 27, 447 N.W.2d at 707 n. 27 (Levin, J., dissenting), nor Med Mutual, goes that far. Med Mutual does argue, however, that proving the amount that the excess judgment holder could collect does not involve any greater complexity and speculation than are involved in determining the loss of future earnings that may be included in the excess judgment against the insured. Med Mutual also submits that the rule it advocates is consistent with the public policy embodied in the $350,000 statutory limit on "noneconomic damages" in an "action for damages for personal injury ... aris[ing] on or after July 1, 1986." CJ § 11–108(b).

We are not persuaded to change the Maryland law of damages in failure to settle cases. The injury to the insured is the continuing existence of the excess judgment. The cost of the cure of that injury is the amount required to satisfy the judgment. Payment of an amount measured by the probability of recovery from the insured personally, if less than the entire excess, does not eliminate the injury. The judgment holder is not restricted in executing on the judgment at any time by the probable assets of the debtor, determined at the time the judgment in the failure to settle case is entered against the insurer. A money judgment in Maryland does not expire until twelve years from the date of entry or most recent renewal. Maryland Rule 2–625. Absent discharge in bankruptcy, the nonexempt assets, including an unanticipated windfall, held by a living individ-

ual who is a judgment debtor, remain subject to execution as long as the judgment remains extant. We adhere to the view that proper compensation for the injury to the insured is the cost of releasing the judgment that should not have been entered.

### III

The remaining issue that will recur on retrial is Med Mutual's contention that the assignment from Beverly to Evans is invalid. Med Mutual emphasizes the following features of that assignment:

—Beverly retained claims for damages other than for the unpaid portion of the judgment, including any claim for emotional distress or punitive damages.[14]

—Beverly's personal counsel, Salsbury, was to receive $50,000 in the event of successful pursuit of the assigned claim. This payment was recited to be for Beverly's "past, present and future legal expenses."

—Beverly was to receive $50,000 in the event of settlement for less than the unpaid portion of the $2.5 million judgment. This was recited to be in "satisfaction for his retained claims." In the event of a recovery greater than the unpaid portion of the judgment, Beverly was to receive sixty percent of the "balance of the settlement funds."

—Evans solely controlled any decision regarding settlement of the assigned and retained claims or any decision regarding appeal from an unfavorable result.

—Evans covenanted not to pursue collection of the unpaid portion of the $2.5 million judgment pending trial of the assigned claim, and appeal, if Evans chose to appeal. How-

---

**14.** In this case Evans sued only on the assigned claim for payment of the unpaid portion of the judgment, and Beverly did not join as a plaintiff to assert any claims, retained by him under the assignment, for emotional distress or punitive damages. Med Mutual recognizes that there was no claim for noneconomic loss actually presented in this case. Accordingly, we need not decide whether and, if so, how, the "cap" statute, CJ 11–108(b), might apply in such a case.

ever, if Evans were not successful in pursuit of the assigned claim, then the right directly to pursue Beverly for the unpaid portion of the judgment would revert back to Evans.

Med Mutual questions whether any bad faith failure to settle claim is assignable, and the insurer submits that the subject assignment, in particular, is invalid because it is collusive, anticipates piecemeal litigation, permits Beverly to escape the consequences of his acts, and includes violations of the Model Rules of Professional Conduct.

██ In Maryland it has long been held that a chose in action may be validly assigned. *See Adair v. Winchester*, 7 G. & J. 114, 117–18 (1835). This rule was restated in *Summers v. Freishtat*, 274 Md. 404, 335 A.2d 89 (1975).

"[A] chose in action, whether arising in tort or ex contractu, is generally assignable. The only limitation, in the absence of a contrary statutory provision, is that the right of action be of a sort which would survive the death of the assignor and pass to his personal representatives."

*Id.* at 407, 335 A.2d at 90–91 (citations and footnote omitted); *see also Hernandez v. Suburban Hosp. Assoc., Inc.*, 319 Md. 226, 234, 572 A.2d 144, 148 (1990).

██ Although we have not explicitly held that a cause of action for bad faith failure to settle is assignable, the general rule favoring assignability and case law elsewhere support that conclusion. It is the rule in the majority of jurisdictions that have addressed the issue. *See, e.g., Consolidated Am. Ins. Co. v. Mike Soper Marine Servs.*, 951 F.2d 186, 190 n. 2 (9th Cir.1991) (applying California law); *Gray v. Grain Dealers Mut. Ins. Co.*, 871 F.2d 1128, 1132–33 & n. 7 (D.C.Cir.1989) (applying District of Columbia law) (citing numerous cases); *Clearwater v. State Farm Mut. Auto. Ins. Co.*, 161 Ariz. 590, 780 P.2d 423, 426–27 (Ariz. App.1989), *vacated in part on other grounds*, 164 Ariz. 256, 792 P.2d 719 (1990); *Samson v. Transamerica Ins. Co.*, 30 Cal.3d 220, 178 Cal.Rptr. 343, 356, 636 P.2d 32, 45 (1981); *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d

654, 328 P.2d 198, 202 (1958); *Aaron v. Allstate Ins. Co.,* 559 So.2d 275, 277 (Fla.Dist.Ct.App.), *review denied,* 569 So.2d 1278 (Fla.1990); *Glenn v. Fleming,* 247 Kan. 296, 799 P.2d 79, 90–91 (1990); *Ganaway v. Shelter Mut. Ins. Co.,* 795 S.W.2d 554, 564–65 (Mo.App.1990); *Dumas v. State Farm Mut. Auto. Ins. Co.,* 111 N.H. 43, 274 A.2d 781, 783 (1971); *Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 223 A.2d 8, 13 (1966); *Mello v. General Ins. Co.,* 525 A.2d 1304, 1305–06 (R.I.1987). All of these cases involve assignments by insureds to the plaintiffs in the underlying actions. We hold that Beverly's failure to settle claim against Med Mutual was assignable to Evans.

 Med Mutual's collusion argument is difficult to summarize. In any event, the factors woven through that argument, considered either separately or collectively, do not mount up to a violation of public policy that would void the assignment. What Med Mutual calls "collusion" is the common interest of Evans and Beverly in having Med Mutual pay the excess judgment. Entry of the excess judgment merely made a reality of the commonality of interest that had been a possibility during the malpractice litigation. Med Mutual's real complaint seems to be the disadvantageous position in which it was placed at trial of the failure to settle case as a result of the assignment. Beverly remained in Barbados, did not testify, and was not subject to cross-examination concerning the apparent fraud on Paul Revere. Salsbury described Beverly's efforts to have Med Mutual settle within policy limits. Worse yet, from Med Mutual's standpoint, is that Evans, the brain-damaged former school teacher, personified Med Mutual's adversary before the jury, even though the claim being asserted was originally Beverly's. All of these factors are problems in trial tactics for litigators, but they do not invalidate the assignment.

 There is no merit in Med Mutual's argument that the assignment is invalid because it splits Beverly's cause of action. Validity of the assignment is unaffected by its

limitation to the excess judgment, without including Beverly's retained claims for damages for emotional distress and for punitive damages. The rule against splitting a cause of action would become relevant if Beverly subsequently were to sue Med Mutual on the retained claims. What we said in *Jones v. Speed*, 320 Md. 249, 259, 577 A.2d 64, 69 (1990), is pertinent here:

"The rule against splitting a cause of action does not mean that a plaintiff may never split a cause of action. It means that if a cause of action is split, certain consequences may follow. A party involved in a motor vehicle accident may sustain both personal injuries and property damages. That party may bring an action for one aspect of damages and not the other, but the prosecution of that action to judgment will preclude a subsequent action for the remaining type of damage."

The final aspect of Med Mutual's public policy attack on the assignment invokes the Maryland Lawyers' Rules of Professional Conduct. Maryland Rule 1230, appendix. The arguments are primarily based upon comparing the face of the assignment with various of the rules. Because the challenged provisions of the assignment facially are not involved with the rules invoked by Med Mutual, we have no occasion to consider whether conflict between conduct in performance of a contract provision and the Model Rules of Professional Conduct would invalidate the contract provision, or the entire contract of assignment.

Med Mutual asserts that the assignment's provision for the payment to Salsbury of Beverly's legal fees and expenses, in connection with the former's representation of the latter, violates Rule 1.5(e) regulating the division of fees between lawyers. The theory seems to be that counsel for Evans is sharing his fee from Evans with Salsbury, who has assumed no responsibility for the representation of Evans. Facially, there is no violation. Facially, Evans, in consideration of the assignment, has made a contingent promise to pay Beverly's legal expenses.

█ Rule 1.8(j) provides, in part, that "[a] lawyer shall not acquire a propriety interest in the cause of action or subject matter of litigation the lawyer is conducting for a client." Evans's contingent promise to pay directly to Salsbury does not violate this prohibition. Salsbury was not conducting the litigation, and the litigation was no longer owned by his client, Beverly.

Med Mutual refers to Rule 3.7(a), which in general proscribes a lawyer's acting "as advocate at a trial in which the lawyer is likely to be a necessary witness." But Salsbury was not counsel for Evans in the instant action. A factual predicate for Med Mutual's invocation of Rule 3.7(a) is that, during Salsbury's testimony at trial, Judge Mitchell at a bench conference remarked to counsel for Evans: "[I]s there any reason why this witness still believes he has to advocate in front of this jury instead of answering questions? Maybe that is a rhetorical question to you." Med Mutual never asked Judge Mitchell to make a fact-finding concerning the alleged violation, and we will not do so as an original matter.

Med Mutual would also have us declare, based solely on what appears in the record, that the amount of the payment to Salsbury for legal services violates the requirement of Rule 1.5(a) that a "lawyer's fee shall be reasonable." Assuming that Med Mutual has standing to question the reasonableness of the fee, a determination, if any, that it is unreasonable would require a factual hearing and findings of fact, none of which have occurred.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT VACATING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMANDING THIS ACTION TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPE-

CIAL APPEALS TO BE PAID BY THE RESPONDENT, DEBORAH L. EVANS.

ROBERT M. BELL, J., dissenting and concurring.

ROBERT M. BELL, Judge, dissenting and concurring.

The majority holds that the cross-examination of a defense witness by the respondent's counsel was so prejudicial as to be incapable of being cured by instructions and, therefore, the trial court abused its discretion in denying the petitioner's motion for mistrial. In so doing, the majority substitutes its judgment for that of the trial court, giving absolutely no deference to the trial court's superior position to gauge the mood and tone of the trial. Indeed, the tenor of the majority opinion makes quite clear that it faults the trial court's exercise of judgment.

The argument that the cross-examination was improper and, thereby, irretrievably prejudiced the defense was also made to the Court of Special Appeals. That court, however, was not persuaded. Deferring to the trial court's assessment of the situation, it had no difficulty rejecting the petitioner's argument that, under the circumstances of this case, a mistrial was absolutely required.

I align myself with the Court of Special Appeals. It is well settled in this State that, "[o]rdinarily the decision whether to grant a motion for a mistrial rests in the discretion of the trial judge," *State v. Hawkins*, 326 Md. 270, 277, 604 A.2d 489, 493 (1992), quoting *Kosmas v. State*, 316 Md. 587, 594, 560 A.2d 1137, 1141 (1989), citing *Wilhelm v. State*, 272 Md. 404, 429, 326 A.2d 707, 714–15 (1974) and *Lusby v. State*, 217 Md. 191, 195, 141 A.2d 893, 895 (1958), and that an appellate court's review of the denial of a motion for mistrial is limited to determining whether that ruling was an abuse of discretion. *White v. State*, 300 Md. 719, 737, 481 A.2d 201, 210 (1984). *See also DeMay v. Carper*, 247 Md. 535, 540, 233 A.2d 765, 768 (1967); *Jacobson v. Julian*, 246 Md. 549, 561, 229 A.2d 108, 116 (1967); *Brooks v. Daley*, 242 Md. 185, 197, 218 A.2d 184, 191 (1965);

*Bailey v. Wray,* 230 Md. 359, 362–63, 187 A.2d 101, 103 (1963); *Thimatariga v. Chambers,* 46 Md.App. 260, 283–84, 416 A.2d 1326, 1338, *cert. denied,* 288 Md. 744 (1980). An abuse of discretion should be found only in the extraordinary, exceptional, or most egregious case. As we said in *DeMay:*

> [T]o [the trial judge's] discretion customarily is left the choice of methods to protect the fair and unprejudiced workings of the judicial proceedings and his decision as to the effect of that choice upon the jury and only in the exceptional case, the blatant case, will his choice of cure and his decision as to its effect be reversed on appeal.

247 Md. at 540, 233 A.2d at 768. *See also Leach v. Metzger,* 241 Md. 533, 537, 217 A.2d 302, 304 (1966); *Nelson v. Seiler,* 154 Md. 63, 72, 73, 139 A. 564, 567 (1927); *Capital Traction Co. v. McKeon,* 132 Md. 79, 90–91, 103 A. 314, 318–19 (1918); *Esterline v. State,* 105 Md. 629, 637–38, 66 A. 269, 272–73 (1907).

Moreover, conduct of a trial, including admission of evidence, is also directed to the considerable discretion of the trial court. *Crawford v. State,* 285 Md. 431, 451, 404 A.2d 244, 254 (1979). In that regard, and clearly relevant to whether there has been an abuse of discretion, judges are presumed to be "men [and women] of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence," a proposition that is of some considerable significance in our jurisprudence. *State v. Babb,* 258 Md. 547, 550, 267 A.2d 190, 192 (1970). They are also presumed to know the law and lawfully and correctly to apply it. *Smith v. State,* 306 Md. 1, 8, 506 A.2d 1165, 1168 (1986), citing *Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583, 587 (1976). Additionally, a judge's presence at the trial, conducting it, with his or her "finger on the pulse" of the situation, *Brooks,* 242 Md. at 197, 218 A.2d at 191, renders him or her the logical and, indeed, the best person to evaluate the existence of prejudice. *Hawkins,* 326 Md. at 278, 604 A.2d at 493. Having lived with the case, the trial judge views the situation in three dimension, up close

and personal, not from a cold record; thus, having closely observed the entire trial, he or she is able to appreciate "nuances, inflections and impressions never to be gained from a cold record," *Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 59, 612 A.2d 1294, 1298 (1992), not to mention being able to assess, firsthand, the demeanor of the witnesses as well as the reaction of the jurors and counsel to those witnesses and to the evidence as it is adduced.

There are, to be sure, cases in which the conduct of counsel is so egregious as to require, as a matter of law, that a trial be aborted. *See e.g. Watters v. State,* 328 Md. 38, 49–50, 612 A.2d 1288, 1294 (1992); *Rainville v. State,* 328 Md. 398, 411, 406–411, 614 A.2d 949, 955 (1992). In such a case, there necessarily will be but one decision that could be made—the declaration of mistrial—and, hence, the denial of a mistrial motion would be a clear abuse of discretion. This, however, is not such a case.

This is not a case in which the trial judge ruled reflexively on a motion, advocated by little or no argument, by simply denying it. Nor is this a case in which the prejudice to the defense was manifest, in and of itself, without the need to refer to the circumstances surrounding the revelation of the offending information. This case does not involve testimony that is inherently unreliable or testimony about a matter, *e.g.,* a lie detector test, *see Kosmas, supra; Guesfeird v. State,* 300 Md. 653, 480 A.2d 800 (1984),[1] that is so prejudicial that the proper sanction for reference to it has been deemed to be a mandatory new trial. Inadmissible evidence is often the subject of a mistrial motion, but seldom is it enough, in and of itself, to justify a mistrial. The surrounding circumstances bearing on how it came before the jury and counsel's purpose in getting it before the jury often, if not always, is important. In other words, the trial judge's

---

1. *State v. Hawkins,* 326 Md. 270, 276, 604 A.2d 489, 492 (1992), makes clear that now even a reference to a lie detector test does not automatically require that a mistrial be granted.

role in the trial ordinarily is not only not irrelevant, but it is usually critical, if not decisive.

The trial judge in this case diligently and conscientiously considered and ruled on the petitioner's mistrial motion. He ruled only after hearing extensive argument and even taking testimony outside the presence of the jury. He was aware, therefore, of the petitioner's concerns and of the precise prejudice the petitioner alleged the cross-examination caused it to suffer. He was also aware, firsthand, of the factors relevant to evaluating the justification of those fears. As the presiding judge, he could see, and, indeed, had seen, the evidence as it unfolded. When the cross-examination was taking place, he had the unique vantage point of being able to observe the jurors' reactions to the offending information. He had presided over the trial for seven days; consequently, he, better than anyone else—certainly better than this Court—could assess: the jury's inclination or proclivity to use evidence of past misdeeds to decide the case and, perhaps, to punish the petitioners; the jury's ability to follow instructions, and the likelihood that the petitioner was irreparably damaged as soon as the offending information was revealed.

We must presume that the trial judge also was aware of the test for declaring a mistrial. Therefore, although he did not explicitly say so, we must also presume that the trial judge determined that the prejudice resulting from the information cross-examination disclosed was not sufficiently egregious, or was not incapable of cure, as to warrant a mistrial. Given the trial judge's unique vantage point, it simply is inappropriate to assume, as the majority appears to do, that he denied the motion uninformed as to relevant circumstances. It was the trial judge who, as the presiding judge, oversaw the empaneling of the jury; consequently, he was fully aware, and must have considered, that the jury was composed of a number of women of child-bearing age and, therefore, the likelihood that they would be offended by the nature of the evidence adduced. Moreover, we must also presume that, when making his prejudice determina-

tion, the court considered, and rejected, the possibility that this jury, like "many lay persons would consider that if Med Mutual would refuse to protect another insured by failing, in bad faith to settle within policy limits in a different case, it would be more likely that Med Mutual failed in bad faith to protect Beverly's interest". [Slip op. at 21]. Certainly, although aware of the possibility, the court could not have believed that the primary purpose of the respondent's cross-examination was to embarrass and harass the witness or that it obscured the real issues in the trial. Had that been the case, we have to presume that, because he knows the law and correctly applies it, he unhesitatingly would have declared a mistrial.

The trial court reviewed the mistrial issue not once, but twice. When the petitioner moved for new trial and/or for judgment n.o.v., it presented the same issues for the trial court's consideration as were presented when it moved for mistrial, with, however, the additional factor that the jury's verdict was now known. Thus, the trial judge was called upon to review the same arguments with the clarity of hindsight. Once again, he denied the petitioner's relief. He decided that the prejudice to the petitioner was not sufficiently egregious as to require, as a matter of law, the grant of a new trial. At that time, he made clear that he believed that the respondent's cross-examination was for a proper purpose, to establish the bias of the witness. It is significant that the court gave no indication that it thought that the jury was unduly influenced by that cross-examination.

There is, perhaps a reason why the trial court did not find sufficient prejudice in this case. The cross-examination about which complaint is made did not permeate the entire trial; and the offending information was not repeated after the court ordered counsel not to pursue the matter further. Thus, it comprised but a small part of the trial. Moreover, the court advised the jury, even though the defense did not request it and, indeed, actually refused the offer of a curative instruction, that it must "assess the evidence in

this case and determine the facts with regard to this case based on what has been presented to you as to this case." Given the trial judge's unique and critical perspective, I believe he adequately addressed and cured any harm that may have been caused by the respondent's cross-examination.

Underlying the majority's opinion, as is also true of the petitioner's arguments, is the notion that, because the misconduct occurred on the last day of testimony, after seven days of trial, the trial judge did not adequately exercise discretion when ruling on the mistrial motion. The Court points out that this judge, early in prior proceedings, had previously declared a mistrial based on conduct similar to that alleged here. It seems to suggest that the trial judge would have reacted differently, *i.e.*, ruled differently, had the offending conduct occurred earlier in these proceedings. There simply is no basis in this record or in fact for any suggestion that the trial judge did anything other than discharge his responsibilities consistent with his judicial oath and fairness to the parties. To imply that the trial judge subordinated the fairness of the proceedings to a perceived need for judicial economy is to do a serious disservice to this trial judge, based on nothing more than speculation and, I suspect, an assessment of how this Court would have ruled had it been entrusted with that responsibility in the first instance. That the trial judge was not motivated by judicial economy, but conscientiously considered, from the total circumstances, as he was required to do, the extent to which the petitioner was prejudiced is displayed very clearly by the way in which he handled the mistrial motion and the motion for new trial. Had the trial judge entertained any thought that the petitioner was irreparably prejudiced, he could have, and I submit, would have, granted appropriate relief in the form of a new trial.

In my view, there is absolutely no basis, on this record, to hold, as a matter of law, that the trial judge abused his discretion. And, because I am in complete agreement with the views expressed in parts II and III of the majority

opinion, I would affirm the judgment of the Court of Special Appeals.